UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-246 (JMB/SGE)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERTO CARLOS MUÑOZ-GUATEMALA,<br><br>Defendant. | **TRIAL BRIEF OF THE UNITED STATES** |

The United States of America by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Assistant United States Attorneys Raphael B. Coburn and Thomas Calhoun-Lopez, respectfully submits its trial brief in the above-captioned case.

## I. INDICTMENT.

Defendant Roberto Carlos Muñoz-Guatemala is charged by indictment with one felony offense: Assault on a Federal Officer with a Dangerous or Deadly Weapon or Resulting in Bodily Injury.

## II. SUMMARY OF THE EVIDENCE AT TRIAL.

The United States anticipates the evidence at trial will prove the following facts:

On June 17, 2025, multiple federal agencies, including but not limited to

the Federal Bureau of Investigation (FBI), Enforcement and Removal Operations (ERO), and Homeland Security Investigations (HSI), attempted to arrest the defendant near his residence in Bloomington, Minnesota. ERO had an administrative warrant for the defendant's arrest due to his unlawful entry into the United States and lack of lawful immigrant status. Agents conducted surveillance of the defendant's residence and, at approximately 8:00 a.m., observed the defendant exit his residence and enter a champagne-colored Nissan Altima. The defendant proceeded to drive away from his residence.

Agents followed the defendant away from his residence and conducted a traffic stop. An FBI agent activated his emergency lights behind the defendant, but the defendant did not immediately pull over. An FBI agent also activated his emergency siren multiple times, but the defendant still did not pull over. A civilian vehicle began pulling out of a residential driveway in front of the defendant's vehicle, causing him to slow down. A vehicle driven by an ERO officer (the "ERO Officer") then pulled diagonally in front of the defendant's vehicle in an attempt to force him to stop. At that point, the defendant's vehicle came to a stop.

In total, there were four law enforcement vehicles on the scene, each with emergency lights flashing at the time of the traffic stop. Both the ERO Officer and an FBI agent parked to the rear of the defendant's vehicle exited their own vehicles to make contact with the defendant. The ERO Officer verbally

identified himself as a federal law enforcement officer. The ERO Officer was also wearing a ballistic vest bearing a large placard on the front that identified him as "POLICE."

Due to the defendant's refusal to pull over, both the ERO Officer and the FBI agent initially had their service weapons drawn and pointed at the defendant. The defendant raised his hands, and the ERO Officer holstered his sidearm. The FBI agent kept his service weapon drawn but pointed down.

The ERO Officer approached the driver's side window of the defendant's vehicle and commanded him to place the vehicle in park. The ERO Officer gave this order in both English and Spanish. The defendant refused to place the vehicle in park, but he did lower the driver's side window a few inches. The ERO Officer asked the defendant to provide written identification. The defendant held his identification document up to the window, and the ERO Officer confirmed that it belonged to the defendant. After showing his identification document to the ERO Officer, the defendant placed the vehicle in park.

The ERO Officer then directed the defendant to lower his window all the way down and to open the driver's-side door. The defendant refused. The ERO Officer warned the defendant that he would break a window if the defendant continued to refuse. The ERO Officer's commands were made in both English and Spanish.

Upon the defendant's repeated refusal to comply, the ERO Officer took out his spring-loaded window punch and broke the driver's-side rear window of the defendant's vehicle. The ERO Officer broke the rear window instead of the front window to avoid covering the defendant in broken glass. The ERO Officer then reached into the defendant's vehicle with his right hand and attempted to unlock the driver's-side door.

While the ERO Officer's right arm was inside the vehicle, the defendant put the vehicle in drive. The defendant turned the wheel to the right to avoid the vehicle in front of him, drove up on the curb, and accelerated away at a high rate of speed. The ERO Officer's right arm was caught in the vehicle. As the defendant fled, the ERO Officer was dragged along with the vehicle as the defendant drove away.

While he was caught in the moving vehicle, the ERO Officer fired his taser at the defendant, striking the defendant with multiple prongs in the side of the head, face, and shoulder. The taser triggered for a couple seconds, but due to the location of the prongs on the defendant's body, the taser did not incapacitate the defendant. The defendant continued to drive away.

After the defendant drove around the ERO vehicle parked in front of him, he reentered the street and began weaving back and forth in an apparent effort to shake the ERO Officer from the vehicle. The defendant drove all the way to the left side of the street. He then turned back to the right and drove up on

the curb again to weave past a vehicle parked along the right side of the road.

In total, the defendant dragged the ERO Officer more than 100 yards down the street for approximately 12 seconds, passing several houses. When the defendant got off the curb and reentered the street for the second time, the force of reentering the street knocked the ERO Officer free from the vehicle and he fell into the street. After the ERO Officer was free from the vehicle, the defendant fled away in his vehicle.

The ERO Officer was bleeding from a substantial wound on his right arm. An FBI agent on scene applied a tourniquet to the ERO Officer's right arm and rendered medical assistance. An agent on scene called 911 to request medical attention for the ERO Officer, and the ERO Officer also called 911 and spoke to an individual from the Bloomington Police Department. Bloomington Police informed the ERO Officer that they had just received a call from an individual at 81XX 14th Ave. in Bloomington, Minnesota, claiming that the defendant was just assaulted by police.

Bloomington Police officers were dispatched to the defendant's location, where he was taken into custody. The defendant had traveled approximately one mile from the location where he dragged the ERO Officer.

The ERO Officer was transported to the hospital, where he received treatment for his injuries. In total, the defendant required more than 50 stitches and suffered multiple large cuts, and abrasions to his knee, elbow, and

face.

### III. <u>WITNESSES</u>

The government currently anticipates calling approximately 5-7 witnesses. All of the government's witnesses will be law enforcement witnesses with the exception of the government's expert witness. The law enforcement witnesses will testify about their experience in law enforcement, the planning of the traffic stop, the traffic stop itself, and what happened after the traffic stop.

The government anticipates calling one expert witness. That expert will testify about the capabilities of the Taser used by the ERO Officer and also that, based on his analysis, the defendant was not incapacitated by the Taser.

Dated: November 17, 2025

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

*/s/ Raphael B. Coburn*
BY: RAPHAEL B. COBURN
BY: THOMAS CALHOUN-LOPEZ
Assistant U.S. Attorneys

6