UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 0:25-cr-00246 |
|  | ) | (JMB/SGE) |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ROBERTO CARLOS MUÑOZ-GUATEMALA, | ) | St. Paul, Minnesota |
|  | ) | **December 8, 2025** |
| Defendant. | ) | 3:26 p.m. |
|  | ) |  |

_____

**BEFORE THE HONORABLE JEFFREY M. BRYAN**
**UNITED STATES DISTRICT JUDGE**

**<u>TESTIMONY OF JONATHAN ROSS</u>**

<u>APPEARANCES</u>:

For the Government:      Raphael Coburn
                         Thomas Calhoun-Lopez
                         UNITED STATES ATTORNEY'S OFFICE
                         FOR THE DISTRICT OF MINNESOTA
                         300 South Fourth Street
                         Minneapolis, Minnesota 55415

For the Defendant:       Eric L. Newmark
                         NEWMARK LAW OFFICE
                         1600 Hopkins Crossroad
                         Minnetonka, Minnesota 55305

Court Reporter:          Nancy J. Meyer
                         Registered Diplomate Reporter
                         Certified Realtime Reporter
                         Warren E. Burger Federal Building
                         and United States Courthouse
                         316 North Robert Street
                         St. Paul, Minnesota 55101

Proceedings reported by certified stenographer; transcript produced with computer technology.

**I N D E X**

PAGE

**WITNESSES**
JONATHAN ROSS
      Direct Examination By Mr. Coburn                    4


**EXHIBITS**
      Government Exhibits 1 through 12                     4
      Government Exhibit 14                                4

## P R O C E E D I N G S

(REPORTER'S NOTE:  Prior proceedings were heard in the above-entitled matter, which were not requested to be transcribed at this time.)

**IN OPEN COURT**

(Defendant present.)

**(JURY PRESENT.)**

THE COURT:  Thank you.  You may be seated.

Go ahead and call your first witness.

MR. COBURN:  Thank you, Your Honor.  The government calls Officer Jonathan Ross.

THE COURT:  Go ahead and step towards that chair.  And before you sit down, turn and face me to be sworn, please.  Raise your right hand.

(Oath administered.)

THE WITNESS:  Yes, sir.

THE COURT:  All right.  You may have a seat.

And now, if you would speak right into the microphone, say your name and spell it for the record, please.  And that does adjust, if you need to move it up or down or pull it closer to you.

THE WITNESS:  Jonathan Ross.  It's J-o-n-a-t-h-a-n.  Last name is Ross, R-o-s-s.

MR. COBURN:  Thank you, Your Honor.

And before I begin asking Officer Ross questions, at

this time the government would move to admit Government's Exhibits 1 through 12 and 14.

MR. NEWMARK:  No objection.

THE COURT:  All right.  Exhibits 1 through 12 -- Government's Exhibits 1 through Government's Exhibit 12 and Government's Exhibit 14 are admitted without objection.

(Government Exhibit 1 through 12 and 14 admitted into evidence.)

MR. COBURN:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. COBURN:

Q.  Good afternoon, Officer Ross.  What do you do for a living?

A.  I'm a deportation officer with Immigration and Customs Enforcement.

Q.  How long, generally, have you worked in law enforcement?

A.  I started in law enforcement in 2007.

Q.  Okay.  And before 2007, were you in the military?

A.  Yes.  I was in the U.S. Army.

Q.  What did you do in the military?

A.  I was in the Indiana National Guard.  I was deployed to Iraq in 2004 to 2005 as a machine gunner on a gun truck, combat logistical patrol team.

Q.  When did you get back from Iraq?

A.  2005.

Q.  And I think you said 2007 you started in law enforcement.  What did you start doing in 2007?

A.  After college, joined the United States Border Patrol.

Q.  What did you do with the border patrol?

A.  I did normal border patrol duties, including line-watch operations, tracking, and I also was a field intelligence agent.

Q.  Just before we get into that, where were you working for border patrol?

A.  Near El Paso, Texas.

Q.  So you mentioned a few things in your role about border patrol.  I think one of them was intelligence.  What sort of work did you do in intelligence with border patrol?

A.  I mainly did -- compiled and analyzed information from raw information, creating an intelligence product and focusing more so on the cartels and drug smuggling and also alien smuggling.

Q.  So from 2007 to when -- so how long were you working at border patrol?

A.  2007 to 2015.

Q.  All right.  And then what did you start doing in 2015?

A.  I joined ICE, Immigration and Customs Enforcement.

Q.  And is it -- are you in the same role now as you were when you joined?

A.  I picked up some different collaterals and some

different duties, but yes.

Q. All right. So we'll work through that. When you say ICE, what is ICE?

A. ICE is an organization that is comprised of three different, like, offices. You have the Office of Principal Legal Advisors. OPLA is what we call them. And they're the immigration attorneys.

And then you have HSI, Homeland Security Investigations.

And you then you have, which is my office, the Enforcement and Removal Operations, ERO.

All three is ICE.

Q. What do you do in your role, I think you said, as a deport- -- deportation officer with ERO? What do you do?

A. I'm currently assigned to fugitive operations. So I target higher value targets in the Minnesota, St. Paul AOR, area of responsibility.

Q. Okay. Do you do any work still with transnational organizations?

A. Yes. I'm still a member of the -- task force member of the Joint Terrorism Task Force with the FBI.

Q. So you mentioned the FBI. In your role as a deportation officer, do you work with any other federal agencies?

A. I pretty much work with every federal agency in law enforcement.

Q. Anything with the FBI specifically?

A. FBI, yes.

Q. Okay. What do you do with the FBI?

A. I am a team leader, and I would have multiple agencies assigned to me. So sometimes it's two -- two FBI agents, maybe like an ATF agent or an IRS agent, and I'm the team leader. So I develop the targets, create a target package, surveillance, and then develop a plan to execute the arrest warrant.

Q. And just so the record's clear, you mentioned ATF. What is ATF?

A. It's the Bureau of Alcohol, Tobacco and Firearms.

Q. Okay. And I think, presumably, everyone knows what the IRS is. But taxes; right?

A. Correct.

Q. All right. You mentioned a few collateral duties that you have in your role as a deportation officer. What are those?

A. I am a firearms instructor, an active shooter instructor. I'm also a field intelligence officer, and I am a member of the SWAT team, the St. Paul Special Response Team.

Q. You mentioned field intelligence officer. What's that?

A. It's very similar to what we do -- what I did in border patrol, but instead of -- we still -- I still investigate

ROSS - DIRECT

some -- when I say investigate, more administrative, sometimes criminal investigations regarding organized crime. So that would include transnational criminal organizations, and we also do national security cases.

Q.   As a deportation officer with ERO, are you authorized to enforce federal immigration laws?

A.   Yes.

Q.   Do your duties include target enforcement?

A.   Yes.

Q.   Could you explain to the jury, what is target enforcement?

A.   Target enforcement would be when we are given a lead, usually happens from -- when someone's fingerprints are submitted to federal databases -- so if someone in Hennepin County gets booked into custody, the fingerprints bounce off -- it's called CJIS.  It's over in, I think, West Virginia, FBI's program, and it branches off to us.

It runs the fingerprints through federal immigration databases, and it bounces back to us, and we're alerted that they're in custody.  And usually with those, those are the ones we usually go after.

Q.   So once you identify a potential target as part of maybe the first step of target enforcement, what do you do after that?

A.   We see how -- the chances of probability of us arresting

them, if their address is good, if that vehicle is registered to them.  And then we'll go out and do -- conduct surveillance and see if their vehicles are there or if we see the person there.  And then once we verify the person is there, then we will develop a plan, course of action, to arrest the individual and take them into custody.

Q.  As part of target enforcement, do you have to determine whether someone has lawful immigration status in the United States?

A.  Yes.

Q.  Okay.  How do you go about doing that?

A.  There's -- there's many different federal databases that we can search, but anyone who has applied for any type of benefit will have their fingerprints taken.  Any permanent resident will have their fingerprints taken.  Anyone that did any type of filing a petition or process will at least have their name in the system.  And further along, they'll get biometrics from that.  So it's a pretty extensive list of individuals that we can vet from.

Q.  So you mentioned, I think, the last step of target enforcement being apprehension; is that correct?

A.  Correct.

Q.  Would that include making immigration arrests?

A.  Yes.

Q.  All right.  Have you received any language training in

connection with your work?

A.   Yes.   I went through three months of Spanish immersion in the U.S. Border Patrol Academy in Artesia, New Mexico.

Q.   You mentioned around eight to ten years with border patrol in El Paso; correct?

A.   Correct.

Q.   When you were stationed around El Paso, did you use Spanish then?

A.   Yes.

Q.   Okay.

A.   Every day.

Q.   So let's turn, then, to the morning of June 17th of this year, 2025.   Were you working that morning?

A.   Yes, sir.

Q.   What were you doing that morning?

A.   We were doing target enforcement on a criminal alien that was living around the Richfield area, and at that time the -- that -- the alien was not there.

Q.   Okay.   And just -- the term alien, just so the jury understands, is that --

THE COURT:   Let's go to the headsets for a moment.

(Bench conference on the record.)

THE COURT:   Okay.   Everybody can hear me all right?

MR. COBURN:   Yes, Your Honor.

THE COURT: What was the question going to be? I didn't want to be --

MR. COBURN: I was going to just simply have him explain what does an alien mean, just so the jury understands, is the technical term.

THE COURT: All right. And when we're talking about -- so there's two things that have come to my mind. I didn't hear any objections from defense yet, so I didn't step in.

But referring to people as aliens is one of those things that some defense counsel might want to object to or -- there's no motion *in limine* in this case, so.

And then the second is the references to a criminal alien. And so I want to make sure we're following closely to the motion *in limine* that was made regarding criminal history.

MR. COBURN: Yes, Your Honor. And I have instructed Officer Ross that he should not bring up the criminal -- the prior criminal conviction at all. So -- and I do not intend to ask any other questions specifically about the defendant's criminal history or that, I think, could reasonably elicit anything about that.

THE COURT: All right. And, Mr. Newmark, I'll just invite you to make any objections you see fitting, and I didn't want to call attention to it if you were avoiding

certain things.  So I'll leave it to you to make any objections that you think are proper.

MR. NEWMARK:  I didn't object to it because I didn't want to draw attention to it.  It's my understanding that in the motion *in limine* the government had agreed that there was not going to be any reference to his criminal history.  I understand that there needs to be some explanation of why he was a target, but it seems to be the proper explanation is that he was not lawfully in the United States.

But I do believe that the officer's statement violated the -- the agreement of the parties in the -- in the motion *in limine*.  I didn't want to object to it and draw further attention to it, but I do believe it to violate the -- my understanding of the Court's orders.

THE COURT:  So we have a question -- the question is:  What were you doing that morning?  And then the answer was:  We were doing target enforcement on a criminal alien that was living around the Richfield area.

Are you asking to strike that answer and the question at this time?  Or do you think it's better now just to leave it and --

MR. NEWMARK:  Yeah, I didn't object to it at the time because I didn't want to draw attention to it.  And if I think we strike the question and answer, it will draw

further attention to it.

THE COURT:  Okay.

MR. NEWMARK:  I might have a question or two on cross-examination about it.  I, frankly, think this is going to come out later anyway.

THE COURT:  What about the term alien?

MR. NEWMARK:  Your Honor, as long as it's defined, essentially, as a person who's not a lawful United States resident or citizen, I don't have an objection to that term per se.  I don't think it's a prejudicial term per se, as long as it's defined correctly.

THE COURT:  Okay.  Well, like I said, if you choose to make any objections, I'll rule on them; and otherwise, I'll leave it to your judgment.

MR. NEWMARK:  Your Honor, I guess at this point I would ask that counsel have a brief conversation with his witness to, again --

THE COURT:  Yeah, that makes sense.

MR. NEWMARK:  -- again, enforce the motion *in limine*.

THE COURT:  Right.  Okay.

And maybe you could also encourage him not to use the term alien anymore.

MR. COBURN:  Okay, Your Honor.  I was going to ask --

THE COURT:  Well, I think you have to ask that question, and I think that's actually very helpful to have, because I don't know that the jurors understand the way the statutes and the terms of the statutes are.  So I think it's a helpful question at this point.

But while you're taking the opportunity to remind him of the ruling on the motion *in limine*, you can also read that reminder as well, and then we'll go back to the inquiry.

MR. COBURN:  Well, Your Honor, in terms of reminding him of the order on the motion *in limine*, I'm a little concerned about how exactly I do that without drawing the jury's attention.

THE COURT:  Oh, I'll let you talk to him just quietly.  You can walk up to the witness box and have a quick conversation with him.

MR. COBURN:  Okay.

THE COURT:  And when you're ready, you can begin again.

MR. COBURN:  Okay.

MR. NEWMARK:  Yeah, no.  That was my understanding of how that would occur.  Thank you.

MR. COBURN:  All right.  Thank you, Your Honor.

THE COURT:  I'll leave the sidebar on.

MR. COBURN:  Okay.  Thank you.

(Proceedings held in open court.)

THE COURT:  All right.  You may continue.

MR. COBURN:  Thank you, Your Honor.

BY MR. COBURN:

Q.  So, Officer Ross, you used the term alien before.  Am I correct in thinking that's just a term that you use -- it's, like, sort of a technical term that you use in your job?

A.  It's a legal definition according to the Immigration and Nationality Act.

Q.  All right.  So what is that term -- you said it has a legal definition.  What does it mean?

A.  It just means someone that's not from the United States.  Not a United States citizen.

Q.  Okay.

A.  It's a general term.

Q.  So you said you were doing -- going to the morning of June 17th, you're doing target enforcement.  At some point -- or, I guess, who were you looking for that morning as it relates to this case?

A.  It was an individual that was in the Richfield area, and his vehicle wasn't there.  His car wasn't there.  So we -- so I broke off and was going to go to the house on 8901 2nd Avenue.

Q.  Okay.  And is that 8901 2nd Avenue in Bloomington,

Minnesota?

A.   Correct.

Q.   Who were you looking for at 8901 in Bloomington?

A.   Roberto Carlos Muñoz-Guatemala.

Q.   All right.  And are you familiar with Mr. Muñoz-Guatemala's appearance?

A.   Yes.

Q.   Have you seen him here in the courtroom?

A.   Yes.

Q.   Could you please point him out and describe what he's wearing.

A.   It's this individual here in the maroon, button-up shirt.

        MR. COBURN:  Okay.  Your Honor, would the record reflect that the witness has identified the defendant?

        THE COURT:  Yes.

        MR. COBURN:  Thank you, Your Honor.

BY MR. COBURN:

Q.   So prior to June 17th, had you done any surveillance of the area around 8901 Bloomington [sic] to determine whether the defendant spent time there?

A.   Yes.  We drove -- I've sent people out there, probably about three or four times, and have never seen his vehicle there.  And this one time, this one day, I went by and his vehicle was there.

Q. So you mentioned a vehicle. Were you aware of a specific vehicle associated with Mr. Muñoz-Guatemala?

A. Yes. I saw him driving it a couple weeks prior, and it was a -- I think a beige-, gold-color Nissan Altima with a black bumper.

Q. So you go over and you're looking at 8901 for the defendant. What was the plan to do -- what was -- what were you planning to do that morning as it relates to Mr. Muñoz-Guatemala?

A. We were going to take him into custody because we -- we had had information he was illegally present in the United States.

Q. Okay. And so on June 17th in the morning, had you determined whether there was previously an arrest order in place for the defendant?

A. Yes.

Q. Okay. So you were there to arrest the defendant as -- due to his unlawful immigration status; correct?

A. Correct.

Q. All right. So, generally, what was the arrest plan that morning?

A. So with a person -- this individual, they're not a -- they're not a final order of removal. They are not a -- been deported before. So we're limited with just strictly administrative arrest authority. So we'd have to either pin

ROSS - DIRECT

him as he's in his vehicle at his house and hope he doesn't run back to the house, because the minute he goes into the house, we can't go in there because it's an administrative arrest warrant.

So the plan was if we're able to, we can pin him there in his house -- in his car. So that was Plan A. Plan B would be to follow him out.

Q. Okay. And then -- I guess, what happened that morning that made you determine which course of action you were going to proceed with?

A. His house is near a park, right across the street from a park. I think there's a school there, and we saw some kids that are out in the street -- or around the area.

Q. So how did that impact what you decided to do?

A. We decided -- I decided it was safer to follow him out and see where he went and try to initiate a vehicle stop away from the neighborhood.

Q. And just to be clear, on the morning of June 17th, what was your role in this operation to take the defendant into custody?

A. I was the team leader.

Q. All right. And were you working with any other federal agencies?

A. I was working with two FBI; one HSI, Homeland Security Investigations; and then one U.S. Border Patrol agent.

Q.  All right.  When you were working that morning, were you on foot or were you in a vehicle?

A.  I was in a vehicle.

Q.  What kind of vehicle were you in?

A.  It's a gold Chevy Tahoe.

Q.  Is that a civilian vehicle or a law enforcement vehicle?

A.  It's a law enforcement vehicle.

Q.  Is the vehicle equipped with police lights?

A.  Yes, sir.

Q.  Where are those lights located?

A.  I have a pair of lights on the grill, and I have a pair of lights in the upper visor.  I have two lights in the back window.  I have them on the side in the back, and I have a light bar in the back window.  And I have lights inside the -- the headlights and the taillights.

Q.  What is the purpose of all those lights?

A.  To identify yourself as law enforcement and to conduct vehicle stops, to inform someone to pull over.

Q.  In your -- well, would it be fair to say that you've been working in law enforcement for 18 to 20 years?

A.  Yes.

Q.  Over that time, how many traffic stops do you think you've made?

        MR. NEWMARK:  Objection.  Relevance.

        THE COURT:  Overruled.

BY MR. COBURN:

Q. How many traffic stops do you think you've made in that time?

A. Hundreds. Hundreds.

Q. And what kind of vehicles were you using -- or how did --

THE COURT REPORTER: Hold on.

MR. COBURN: Apologies.

THE COURT REPORTER: Slow down. "What kind of vehicles were you using" --

MR. COBURN: I'm sorry.

THE COURT: She's repeating back your question. Maybe you want to rephrase.

MR. COBURN: I'll rephrase the question. I think I changed my mind what I was going to ask in the middle. So my apologies.

BY MR. COBURN:

Q. How did the vehicle that you were using on June 17th compare to the vehicles that you'd previously used to conduct those hundreds of traffic stops?

A. They're very similar, with no markings. They're unmarked units with lights. We use the same thing in the border patrol. I did drive a marked unit in the border patrol too, but we did also use unmarkeds.

Q. To your personal knowledge, in making those hundreds of

traffic stops over the last 18 to 20 years, has anyone ever become confused about whether you were a police officer?

MR. NEWMARK:  Objection.  Foundation and relevance.

THE COURT:  Sustained.

BY MR. COBURN:

Q.  So we were talking about your police vehicle.  Is it equipped with a siren?

A.  Yes, it is.

Q.  How loud is that siren?

A.  It's very loud.

Q.  And you mentioned you were there with at least three other federal officers; correct?

A.  Correct.

Q.  Were each of them in separate vehicles?

A.  Yes.

Q.  So there's a total of four law enforcement vehicles?

A.  Correct.

Q.  Were their vehicles equipped with police lights?

A.  Yes.

Q.  How did their police lights compare to the ones that were on your vehicle?

A.  They're very similar, if not the same.

Q.  And what were you wearing that morning?

A.  I was wearing my body armor, which includes hard plates.

I have a police placard on the front.  And then regular pants, and I had an ICE-issued T-shirt.  And then I had my duty belt with my gun on there, Taser, and badge.

Q.  Where was your badge located?

A.  Right next to my -- my -- my right side, right next to my pistol.

Q.  All right.  Were you wearing any other equipment, sort of, that was attached to the vest or being carried in the vest?

A.  Handcuffs.  I had some submachine magazines.  I had a police placard with a flip-down for a -- it's a phone carrier.  And there's a placard on that.  Placard on the back that says police.

Q.  Were you wearing a mask to conceal your face?

A.  No.

Q.  The other three agents who were with you, what were they wearing?

A.  Very similar, except theirs said FBI.  I think they didn't have hard plates on theirs.  Theirs was soft armor, but it was still green, just like mine.

Q.  Were any of them wearing masks?

A.  No.

Q.  Were you wearing a body-worn camera at the time?

A.  No.

Q.  Why not?

A.  Our field office does not have a body-worn camera policy; so we cannot wear them.

Q.  Were any of the other agents that were with you wearing body-worn cameras?

A.  Yes.

Q.  How many?

A.  Two that I know of.

Q.  All right.  So let's go to the traffic stop here.  You said you're doing surveillance around 8901 in Bloomington that morning.  At some point did you see the defendant leave the residence?

A.  Yeah.  He's in my binos, and I set up in a good position, I believe on 2nd Street, and I can see him -- see him come out to his car, getting into his car, and then he backed out.  And he ends up turning the way I didn't think he was going to go.  He went up, actually, right by me, up 2nd Street North, up 2nd Street.

Q.  Around what time did this happen?

A.  Probably a little bit before 8:00.

Q.  I'm going to show you what's previously been admitted as Government's Exhibit 1.

        MR. COBURN:  Your Honor, could we --

BY MR. COBURN:

Q.  Are you seeing that in front of the screen?

A.  No.

        I can see it now.

Q.   There we go.   Okay.   Now the jury can see it too.

        So what is Government's Exhibit 1?

A.   It's a map.

Q.   Okay.   And what area does it capture?

A.   It captures the area this incident all took place.

Q.   Do you see 89- -- or could you put an X on the map,
generally, where 8901 is.

A.   (Witness complying.)

Q.   All right.   And so that's right around the intersection
of 89th Street and 2nd Avenue; correct?

A.   Correct.

Q.   All right.   Once the defendant left --

        THE COURT:   Mr. Coburn, why don't you describe
where that is.   It's a little hard to see on the screen.   So
why don't you describe for the jury so they're -- and the
record will reflect exactly where he put the X.

BY MR. COBURN:

Q.   So fair to say that you put a blue X on the screen sort
of in the bottom left-hand corner; correct?

A.   Yes.

Q.   All right.   So you said you saw the defendant leave in
his vehicle.   Which way did he head?

A.   He headed north up 2nd Street.

Q.   2nd Avenue?

A.  2nd Avenue, yep.

Q.  Okay.  So he headed north up 2nd Avenue.  At this point, what did you do?

A.  I kind of ducked down a bit so he couldn't see me, so that I can -- but I kept eyes on him to visually ID him as the driver.  And then I radioed in for the next available unit that's set up, just in case he went this way, they can follow in behind him as a tail.

Q.  All right.  Did anyone else get behind the defendant's vehicle as he was headed north on 2nd Avenue?

A.  Yes.  The FBI.

Q.  Do you remember which agent?

A.  Bernardo.

Q.  Is that Bernardo Medellin?

A.  Yes.

Q.  All right.  At some point did you get behind the defendant's vehicle?

A.  Yeah.  I was able to turn around and get behind -- I believe I got behind Bernardo relatively quickly.

Q.  So the defendant's vehicle is headed north on 2nd Avenue, and Bernardo Medellin is behind it.  You're behind Bernardo.  At some point does the vehicle make any turns off of 2nd Avenue?

A.  Yes.  It turns going eastbound on, I believe, 86th Street.

Q. Could you, just -- just so the jury can see it, put an X at the intersection between 2nd Avenue and 86th Street.

A. (Witness complying.)

Q. All right. And so the record is clear, you've put a blue X kind of in the middle of the map on the left side of the screen at the intersection between 86th and 2nd Avenue; correct?

A. Correct.

Q. Once the defendant got to 86th Street, what did he do next?

A. He took -- took a right and started heading eastbound.

Q. And I forgot to ask. You're headed north on 2nd Avenue, and multiple vehicles are following the defendant. At this point have any of you activated your emergency lights?

A. Not yet. We're waiting until we have enough units with us.

Q. So the defendant makes the right turn on 86th. Does he start driving down 86th?

A. Correct.

Q. Do you continue to follow him?

A. Yes.

Q. At this point as he's headed down 86th, to the east, how many law enforcement vehicles are behind him?

A. I believe they're pushing at this time about -- maybe three, and the fourth one is coming up behind.

Q.   At some point while your -- all those vehicles are headed down 86th Street, do you activate your police lights?

A.   Yes.  I believe around 4th Avenue or Clinton Avenue. You want me to mark it?

Q.   Sure.

A.   I'll put a circle there.

Q.   All right.  So you've put a blue circle on the screen sort of a couple blocks to the right of the intersection between 86th and 2nd Avenue; correct?

A.   Correct.

Q.   All right.  So do just you turn on your police lights, or did the other vehicles turn on theirs as well?

A.   Everybody turned theirs on.  At least I turned mine on, and the FBI, Medellin, he turned his on too.  He turned on his before.  I told him to turn them on before me.

Q.   At the point that you and at least Special Agent Medellin turned on your police lights, did the defendant then immediately pull over?

A.   No.  He failed to yield.

Q.   What do you mean by failed to yield?

A.   He failed to pull over.

Q.   How -- what did he do instead?

A.   He just kept driving eastbound on 86th Street.

Q.   While he was driving eastbound on 86th Street, did you notice any other vehicles doing something that caught your

attention?

A.    Other vehicles on the road were pulling over to the side to let us through.

Q.    You say all the other vehicles?

A.    The vehicles going westbound were pulling over.

Q.    Okay.  At the point -- so as you're going down 86th to the east, what is the distance between the defendant's vehicle and Special Agent Medellin's vehicle?

A.    Looked about one car length.

Q.    Were there any other vehicles between Special Agent Medellin's vehicle and the defendant's vehicle?

A.    No.

Q.    Were you, from your vantage point, able to see any visual obstructions in the road that would have prevented the defendant from seeing Special Agent Medellin?

A.    No.

Q.    So you're following the defendant east down 86th Street, and you said other vehicles were yielding.  At some point did the defendant -- well, at some point did you get in front of the defendant's vehicle?

A.    Yes.  Probably before we got to Park Street.  I can mark that here.  Around this -- there was like a turn lane, like a divider and -- around this area, and I was able to, with my full lights on and siren, pull alongside him and then get in front of him.

Q.  So your siren was activated at this point?

A.  Yes.

Q.  All right.  It's pretty loud; correct?

A.  Yes.

Q.  As you got in front of him -- and just to clarify as well -- I apologize.  The rear of your vehicle, you have lights on there as well; right?

A.  Correct.  I have a light bar and two lights on the back driver's and passenger window -- or in the back.  In the very back, there's two small lights.

Q.  At the point that you were in front of the defendant's vehicle, were those lights on?

A.  Yes.

Q.  After you got in front of him, did he then pull over?

A.  No.

Q.  What did he do instead?

A.  By the time he got to -- close to 12th Avenue, I was putting on my brakes, do like a -- block him in, and there was a school bus that was coming westbound in that area, and then he -- he turned off in front of the school bus.

Q.  Did you find that concerning?

A.  Yes.

Q.  What about it was concerning?

A.  It's not what most people do.

          MR. NEWMARK:  Objection.  Foundation.

THE COURT: Why don't you lay some additional foundation.

BY MR. COBURN:

Q. So, Officer Ross, you said you've done hundreds of traffic stops before. In those hundreds of traffic stops, has anyone ever tried to flee from you?

MR. NEWMARK: Objection. Relevance. Foundation. Facts not in evidence.

THE COURT: Overruled on all three.

BY MR. COBURN:

Q. Has anyone ever tried to flee from you in that time?

A. Yes.

Q. And what do people who -- in your view, people who are attempting to flee from you, what are they doing? What do they do?

A. They do erratic behaviors. They take great risks, and they seem to not be aware of other people driving on the road. They usually -- they make just extreme movements with their vehicles.

Q. So based on your experience that you've just described, how did you become concerned about the defendant's driving conduct?

A. I was concerned that at that point he was -- there was no doubt that he was attempting to flee and he'd just cut off a school bus.

Q.   Which street -- could you put an X on the map, which -- which street -- where did the defendant make this left turn?

A.   I believe it was on 12th.

Q.   Could it have been 11th?

A.   Or 11th.  Around this area.

Q.   All right.  So how fast did the defendant make that turn?

A.   It was very fast.  I couldn't make the turn.  I had to hit my brakes and then get up over the curb and the sidewalk to make the turn.

Q.   Was Special Agent Medellin able to make the turn with the defendant?

A.   Yes.

Q.   And so -- just so we're looking at the map here, approximately how many blocks did the defendant go from when you activated your police lights to when the defendant made the left turn on 11th?

A.   About nine.  At least nine.

Q.   Okay.

A.   Nine or ten blocks.

Q.   So after the defendant made the left turn onto, let's say, 11th, did he stop at that point?

A.   No.

Q.   Did he eventually come to a stop?

A.   I had to go around him again, and at that time there was

ROSS - DIRECT

a Jeep backing up out of their driveway, and so he -- and I was next to him. So he had to stop for that. And then I was able to pull -- block him in the front.

Q. You say block in. What do you do with your vehicle to get in front of him?

A. I positioned my vehicle in what's called a front block where you block them from going forward and you bring them to a halt. There's no contact.

Q. Were any other of the federal agents who were assisting you with this, did any of them arrive around the same time as you?

A. Yes. Medellin was right around, and then Todd was right behind him.

Q. And you used the name Todd. Are you referring to Todd Schallberg?

A. Yes.

Q. And is he also a special agent with the FBI?

A. Yes.

Q. Okay. So at the point at which you've pulled in front of the defendant's vehicle and he's come to a stop, are your police lights still on?

A. Yes.

Q. What about the police lights of the agents who are behind you?

A. Yes.

Q.   Okay.  So once everybody's stopped, what did you do next?

A.   Because of the -- his erratic driving and we just almost -- we had a little failure-to-yield pursuit, and that we came out, as we'd always been trained and always do, with our weapons, pistol.

Q.   So you were armed with a pistol at this time; correct?

A.   Correct.

Q.   And is it -- it's drawn?

A.   Yes.

Q.   Was the firearm drawn, in part, because of the way the defendant had been fleeing, in your opinion?

A.   Yes.

Q.   What did you do with your -- your pistol?

A.   So we point at him, yell "Police."  And I believe Bernardo pointed his as well.  And then "Hands up."  And then when he started complying, put his hands up, then holstered the pistol because now he's compliant.

Q.   Okay.  Did you -- you said he raised his hands?

A.   (Witness nods head.)

Q.   Did you order him to do anything else?

A.   Yeah.  As I approached, I identified myself, again, as police, both in English and Spanish, and then I -- I told him to turn off the vehicle and put it in park.

Q.   Did he turn off the vehicle?

A.   No.

Q.   Did he put the vehicle in park?

A.   Not right away.

Q.   Where were you, like, in relation to the defendant at the time that you're making these -- you're giving him these demands?

A.   Up in his driver's side window.

Q.   Were you able to see into his vehicle?

A.   Yes.

Q.   All right.  And so were the windows tinted or not tinted?

A.   No, they weren't tinted.

Q.   All right.  Did you give him any other commands as it relates to the window?

A.   I gave him commands in Spanish and English to roll down the window, and I told him to put the vehicle in park and turn it off.

Q.   Did he roll down the window?

A.   He cracked it.

Q.   About how much did he crack the window?

A.   About 3 or 4 inches.  Maybe a little more.

Q.   And you said, again, you asked him to put the vehicle in park and turn it off.  Did he do that?

A.   No.

Q.   At some point when you're interacting with

ROSS - DIRECT

Mr. Muñoz-Guatemala, did you ask him to provide you with identification?

A.   Yes.

Q.   And how did he respond to that request?

A.   He pulled out an ID card -- I believe it was either a Minnesota ID card or driver's license -- and put it up to the window.

Q.   And at that point did he do anything with -- in terms of the vehicle being in park?

A.   No.  Because I believe at that time I pulled out my Taser because he wouldn't put it in park.  And as long as that vehicle is in drive, it's -- it's a threat to everybody at the stop.

Q.   All right.  Well, how many times do you think you identified yourself to Mr. Muñoz-Guatemala as a federal law enforcement officer?

A.   At least four or five times.

Q.   Was that in English and Spanish?

A.   Yes.  Both.

Q.   How many times do you think you told Mr. Muñoz-Guatemala that you were police?

A.   Three or four times -- or four or five times.

Q.   English and Spanish?

A.   English and Spanish.

Q.   What did you say to Mr. Muñoz-Guatemala about why you

were there?

A.  I also informed him in English and Spanish I was an immigration officer, and I asked him to state his citizenship and asked him if he was a U.S. citizen or not.

Q.  How did he respond to those questions?

A.  He reported he was not a U.S. citizen, and then he refused to answer any other questions.

Q.  Did you tell him anything about, specifically, what branch of federal law enforcement you were working with?

A.  I told him in Spanish that I was a federal immigration officer, is how it translates.

Q.  All right.  Did you give him any commands after that?

A.  I asked him, again, to roll down his window and put the car in park.  I believe he ended up putting the car in park at some point, and I holstered up my Taser.

Q.  Did he at any point turn off his vehicle?

A.  No.

Q.  Had you asked him to turn off his vehicle?

A.  Repeatedly.

Q.  In English and in Spanish?

A.  Yes.

Q.  While you were communicating with the defendant, what kind of impression did you get as to whether he understood English?

A.  He replied back a lot in English, and he -- I had no

concerns he didn't understand.

Q. When you say replied back in English, what do you mean?

A. He would -- he would reply back he wants his attorney, I believe he said. He kept asking -- he just wants to -- he wants to leave.

Q. Okay. Did he ask you anything about why you were there?

A. In the beginning, he did. He was asking, you know, what's this for? What's this about?

Q. And those questions, were they in English or in Spanish?

A. They were in English.

Q. So based on the fact that, you know, as you've said, the defendant didn't roll down the window or -- all the way or turn off the car, was maybe not complying with other commands, at some point what did you tell him you would have to do if he refused to open the door?

A. I told him that if he refused to open the door and roll down the window, that we would break his window.

Q. How many times did you warn him about that?

A. Three times.

Q. And what were you going to break his window with?

A. I have a window punch.

Q. What's a window punch?

A. It's a -- it's a metal piece with a spring on it. It looks like a pin, and you pull back the spring and -- after you put it up next to the window, and then it'll break the

window.

Q.  Did you show the window punch to Mr. Muñoz-Guatemala?

A.  I did.

Q.  How many times did you show it to him?

A.  Once or twice.  I held it up.  I held it up and said, "I'm going to break your window."  And then I held it up to the window.

Q.  And did he at that point open the door or turn off the vehicle or comply with the other commands you had given him?

A.  I saw him -- he already had put it in park, but he didn't turn off the vehicle.  He wouldn't roll down the window.  Nothing.

Q.  Okay.  So what did you ultimately decide to do with the window punch?

A.  I decided to break the window, and I thought I could get in there and pop the door and unlock it.

Q.  Which window did you decide to break?

A.  At that time we were trained to break the window that the person is not sitting close to so that way they don't get glass on them and they don't get injured.  So I broke the back -- driver's side back window.

Q.  All right.  After you broke the window, what did you do next?

A.  I reached in to unlock -- to pop the door using the door handle.

Q.  While you were doing that, what happened?

A.  I remember seeing him put the vehicle in drive, and then I -- he just took off in a rapid speed.

Q.  Which direction did he go in?

A.  North.  He went -- he turned towards the grass, right near my vehicle, and went up over the grass.

Q.  I'm going to show you now what's already been admitted as Government's Exhibit 2.  So do you recognize Government's Exhibit 2?

A.  Yes.

Q.  What is it?

A.  This is the vehicle.  This is just shortly after I punched the window.  It shows Special Agent Medellin right behind me, right beside me.

Q.  All right.  And so what -- we're just going to watch this once at full speed, and then I think what I'll do is we'll play it again in slow motion and I can ask you some questions about it as we do that.  All right?

A.  Yep.

Q.  So now we'll play it once at full speed.

(An audio-visual recording was played.)

BY MR. COBURN:

Q.  All right.  Let's go back to the beginning then, if I can.  And then we'll now play this in slow motion.  I'll ask you some questions about it as we go.

ROSS - DIRECT

Before I start, we're right at the beginning of the video, hasn't started playing yet. What are you able to see, like, right in the middle of the screen with respect to the window?

A. I had already broken the window at this point.

Q. All right. And what -- does something appear to be falling out of the vehicle?

A. Glass.

Q. All right. And is that from the window you had just broken?

A. Yes.

Q. All right. So I've have stopped it here. I think we're somewhere in the vicinity of 1 second in. What are you doing at this moment?

A. I'm reaching in to unlock the door, and usually you pull a door handle and the door opens up.

Q. Who is this person to, I guess -- on the screen to the left of you, the first person to the left of you?

A. That's Bernardo Medellin.

Q. All right. And what is -- is he with the FBI?

A. FBI.

Q. What is he wearing?

A. He's wearing a soft armor, body armor, with FBI markings.

Q. There's another individual all the way on the left side

of the screen.  Who is that?

A.  That is Yue Her, special agent, HSI.

Q.  What is that person wearing?

A.  He's wearing body armor.  I'm unsure if it's hard plates or soft armor, but with a police placard.

Q.  Let's start playing, again, in slow motion.

(An audio-visual recording was played.)

BY MR. COBURN:

Q.  So we stopped now about 3 seconds in.

What did Special Agent Medellin just have to do?

A.  He had to move out of the way.

Q.  All right.  And why did he have to move out of the way?

A.  Because the car would have run him over.

Q.  At this point what's happening with you in the video?

A.  At this point I was trying to get my arm out and it -- I couldn't get it out at that point.

Q.  Did you try to get it out?

A.  Yes.

Q.  And you were unsuccessful?

A.  Yes.

Q.  All right.  What were you feeling as you tried to pull it out?

A.  I was fearing for my life.  I knew I was going to get drug.  And the fact I couldn't get my arm out, I didn't know

how long I would be drugged.  So I was kind of running with

the vehicle.

(An audio-visual recording was played.)

BY MR. COBURN:

Q.  Okay.  You just -- I just played again for a split

second.

I think you said you were running with the vehicle?

A.  Yes.

Q.  Why did you want to run with the vehicle?

A.  Because I didn't want to get drug and pulled underneath

the back of the tire.

Q.  All right.  We'll resume playing.

(An audio-visual recording was played.)

BY MR. COBURN:

Q.  Just stopped at 4 seconds in.

What's happening here?

A.  I almost -- he almost swiped me off on my vehicle, and

at this point I feared for my life.  And the only thing I

had in the -- in my left tools to use was my Taser.  So I

quickly drew my Taser.

Q.  What did you do with your Taser?

A.  I deployed it.

Q.  When you say deployed, what does that mean to a normal

person?

A.  I shot it.

Q.   Okay.

A.   The Taser.

Q.   How were you able to shoot it at the defendant from where you were?

A.   I got it right through the window crack.  I put it in there, where I thought he was at, and I just pulled the trigger.

Q.   Do you know how many times you pulled the trigger?

A.   It deployed ten -- ten rounds.

Q.   And how many -- what's the maximum number of rounds it can deploy?

A.   Ten.

Q.   Did you have a perception -- were you able to perceive, I should say, whether you were able to strike the -- Mr. Muñoz-Guatemala with the Taser?

A.   I did see the impacts on his face.

Q.   Okay.  Were you able to see whether it made any impact on him?

A.   It didn't appear that it affected him at all.

Q.   We'll keep playing, again, in slow motion.

         (An audio-visual recording was played.)

BY MR. COBURN:

Q.   We'll stop here at 7 seconds in.  And I know it's a little bit blurry.

         But what just happened in the portion of Government's

Exhibit 2 that we just watched?

A.  He's dragging me.  At some point I couldn't keep up with the speed, and then he pulls onto the -- onto the street, in the middle of the street.

Q.  Was he in the middle of the street, or is he on one side or the other?

A.  Looks like he's maybe moved over to the left side of the street.

Q.  Okay.  Any other traffic on the street at this point?

A.  No.

Q.  Where are you at this point in relation to the vehicle?

A.  I'm still hanging on, and I think at this point I'm being drug.

Q.  Were you able to keep running to keep up?

A.  No.

Q.  So what's happening with your legs at this point?

A.  My legs, I'm trying to keep -- my upper strength to keep me from getting swept underneath the vehicle.

Q.  What was your concern about what would happen if you went under the vehicle?

A.  I'd get run over and serious injury or death because my arm is still caught.  And I knew it would be -- who knows what would happen if my arm got caught and my leg gets put underneath the wheel.

Q.  We'll keep playing the video now in slow motion.

(An audio-visual recording was played.)

BY MR. COBURN:

Q.  So we'll stop it at 10 seconds in.

What just happened in the portion we just watched?

A.  He veers towards that parked car onto the grass.  I'm still hanging on.

Q.  At this point, any other traffic on the street?

A.  No.

Q.  And when you say still hanging on, are you in the same position you were in on the -- hanging from the left side of the vehicle?

A.  Correct.

(An audio-visual recording was played.)

BY MR. COBURN:

Q.  I should have asked you -- - my apologies.  In the previous 10 seconds or so of you being dragged, were you making any noise?

A.  Yes.  I was yelling at him to stop.

Q.  How many times did you yell at him to stop?

A.  Over and over and over again at the top of my lungs.

Q.  So as loud as you could?

A.  Yes.

Q.  All right.  Did the defendant stop?

A.  No.

(An audio-visual recording was played.)

BY MR. COBURN:

Q. So I've stopped it at 14 seconds into the video.

What just happened in the portion we watched?

A. He had cut back onto the road, right at that vehicle that's parked there.

Q. How close did you come to hitting that vehicle?

A. I would say I was at least probably under a foot, maybe. Maybe a foot.

Q. I'll keep playing.

(An audio-visual recording was played.)

BY MR. COBURN:

Q. We stopped at 15 seconds.

What's just happened here?

A. This point, after he comes off the curb, I was able -- I just got jarred loose apparently, because I was able to fall out of the vehicle, and I rolled on the road.

Q. So I'm going to zoom in here, if I can. So I've just zoomed in, sort of, in the far part of the screen there where you can see a couple of vehicles. Are you able to see yourself in this image?

A. Yes.

Q. And where are you?

A. Right in front and a little bit to the left of that parked vehicle.

Q. Okay. As you landed and came out of the vehicle, were

ROSS - DIRECT

you aware of whether -- were you in any pain at that point?

A.   At that point I was still in the survival mode.  So I remember I did, like, a barrel roll and I came up with a self-preservation check with my pistol, as trained, just in case he tries backing into me.  And then -- and then after he drove off, I holstered up again, and I noticed my arm was bleeding.

Q.   How badly was your arm bleeding?

A.   It was pretty bad.  It was dripping.  The blood was dripping all over.

Q.   What sort of wound or wounds did you have to your -- was this your right arm?

A.   Right arm, deep laceration.  And my left hand had some -- a laceration on it as well.

Q.   Let's just play now the rest of the video in slow motion.  And we can move it up to 50 percent speed.

        (An audio-visual recording was played.)

BY MR. COBURN:

Q.   So we've come to the end of the video.

        Were you able to see as you were watching whether the police vehicles that were moving -- that were going by, did they have their lights activated?

A.   Yes, they did.

Q.   Only some of them or all of them?

A.   All of them.

Q. From your position of being dragged, what was your perception of how fast the defendant was driving?

A. At the time it just seemed -- at least to me it seemed like he was doing, like, 40 miles an hour at least, if not more.

Q. How far were you dragged?

A. I would say at least a hundred yards.

Q. I'm now going to show you what's already been admitted as Government's Exhibit 3.

Do you recognize Government's Exhibit 3?

A. Yes.

Q. It's a series of screenshots; right?

A. Uh-huh.

Q. Okay. So we've already talked about Special Agent Medellin at this point. So I guess we'll just kind of go through these quickly. So starting going from the -- actually, the rear of your vehicle there, it's on the left side of the vehicle; correct?

A. Correct.

Q. The -- your taillights appear to be on there; correct?

A. Correct.

Q. Were they flashing?

A. Yes, they flash.

Q. Going forward, what are you doing with your -- now we're on the second page of Government's Exhibit 3. What are you

doing with your left arm?

A.  Right now I'm drawing my Taser.

Q.  Now, the third page of Government's Exhibit 3, what's happening here?

A.  I'm almost in a complete draw.  I'm still running with the vehicle slightly so I don't get dragged.  And then at this point, I'm lucky I'm able to keep up with it, so.

Q.  What do you see on the back of your vehicle at this point?

A.  My emergency lights.

Q.  Blue lights?

A.  Correct.

Q.  All right.  Now on to the fourth page, what are you doing with your left arm here?

A.  At this time, I'm bringing my Taser up to the crack of the window and I'm deploying my Taser.

Q.  Fifth page of Government's Exhibit 3, what's happening here?

A.  This point, I can't keep up anymore and I'm being dragged.

Q.  What's happening here on the sixth page?

A.  I'm getting dragged up over the curb towards a parked car.

Q.  And here in the seventh, what's this?

A.  I'm on the grass and getting ready -- he's coming over

in front of the parked car.

Q.   Now 8.

A.   Looks like I'm going to be jarred loose, but it looks like I'm coming really close to that parked car.

Q.   And 9.

A.   This is where I -- I am coming loose.  I started sliding on the road.

Q.   And then 10.

A.   This is where I'm laying on the ground.

Q.   Now 11.

A.   The agent's walking back to my vehicle with the emergency lights still activated.

Q.   Yeah.  What can you see on your vehicle?  And this is the 12th image.

A.   This is emergency lights because it's a picture.  It's only picking up the ones that are activated that split second, but there's -- there's more lights on that front visor than that.

Q.   And here in 13, what do we see?

A.   Emergency lights.

Q.   Okay.  So now let's go to Government's Exhibit 4, which is already in evidence.

     Do you recognize Government's Exhibit 4?

A.   Yes.

Q.   What is it?

A.   This is the beginning of the vehicle stop where the lady in the Jeep backed out.

Q.   And so you've referenced a Jeep.  Where is the Jeep on the screen?

A.   It's right in the driveway.  She had already pulled it back up on the driveway.

Q.   And are you referring to this red vehicle here in the middle of the street?

A.   Correct.

Q.   And look -- if you look in the top left-hand corner, do you see the word Ring?

A.   Uh-huh.

Q.   Where does this footage come?

A.   It's from a doorbell camera, a house in front of the vehicle stop.

Q.   All right.  So now I'm going to play this, Government's Exhibit 4.  We'll just play it through, and then I'll ask you some questions about it.

        (A video recording was played.)

BY MR. COBURN:

Q.   So we finished Government's Exhibit 4.

        What were you able to see there as it pertains to your vehicle and the vehicle directly behind the defendant's car?

A.   All the emergency lights have been activated.

Q.   Okay.  And what color were those lights?

A.   They're a mixture of red, blue, and then some white strobe.

Q.   We'll go quickly to Government's Exhibit 5.

What's this?

A.   It's a still image of the Ring camera.

Q.   I know it's just a split second in time in this image, but are you able to see in this image whether the emergency lights are on?

A.   Yes.

Q.   So let's talk about what happened after you came loose from the defendant's vehicle.  Where did he go?  Where does his vehicle go?

A.   His vehicle went up around my vehicle, across the driveway or -- and then he crossed back on the street.

Q.   So, like, your -- I guess I'm not sure I was -- I'm not sure my question was clear.  You have fallen from the vehicle.  Where did he go after that?

A.   After I had fallen from the vehicle?

Q.   Yes.

A.   Oh.  He kept going north on that street.

Q.   You said before that you -- when you got up, you were not yet feeling any pain; correct?

A.   Correct.

Q.   Did you eventually start feeling pain?

A.   Yes.

Q.   How much pain was it?

A.   It was pretty excruciating pain.

Q.   Did any of the other agents who were with you do anything to help with your injuries?

A.   Yes.  I was bleeding quite a bit.  So one of the FBI agents put a tourniquet -- Special Agent Medellin put a tourniquet on my upper arm to help stop the bleeding.

Q.   And for those who may not know, what is a tourniquet?

A.   A tourniquet is a -- it's like a strap that you can tighten down that compresses against the arteries that stops the blood flow to that extremity.

Q.   Other than the tourniquet, did you receive any other medical attention on the scene?

A.   Yes.  An ambulance was called, and they came out and took a look at me and bandaged me up and --

Q.   All right.  So we'll go to Government's Exhibit 7 then.

     What's depicted here on the first page of Government's Exhibit 7?

A.   That's after the ambulance came.  I was still there at that time, and they had bandaged me up, and you can -- I was just kind of standing there when they took the picture.

Q.   So here in this image, let's kind of go through a few things.  I'm going to zoom in here.

     What is -- just, I guess, walk us through -- walk the

Q. jury through, what are they looking at right now?

A. It's my body armor. So from the very top, that's a flip-down -- you put your phone in there. We have different programs where we can see where people are at, our people, like a Blue Force Tracker, so you can track where all of our agents are. That's what that phone carrier is. On top of that is the -- our police placard.

Q. And underneath -- or, I guess, before we get to that, to the side of your police placard, what is that kind of black box?

A. That's a -- that's a com suite made by INVISIO. It's -- it hooks up to your headsets. You see them dangling down there. And you use some AI to -- to filter out certain sounds and amplify different sounds.

Q. Going now below the police placard, what are these objects, sort of, in the middle of your chest there?

A. In the middle is my flashlight, and then the two pieces with the tan marks on them -- excuse me -- that is my submachine gun magazines.

Q. And going lower, below the magazines, what's on your right hip?

A. My right hip is my pistol.

Q. And what's on your left hip?

A. Left hip is going to be my Taser.

Q. Is the Taser still there?

A.  No.

Q.  Do you know where the -- did you know where the Taser was at this point?

A.  No.  Right after I did the -- I got up from the fall, I was looking for my Taser.  We couldn't find it.  We couldn't locate it.  So at that point I didn't know where it was at.

Q.  Let's go to the second image here, second page of Government's Exhibit 7.

What's the jury looking at now?

A.  It's the back of my armor.  You have the police placard.  We have my first aid pouch right underneath it.  And then you've got some cuts.  And then my cuff pouch is there, my left side.

Q.  So I'm going to zoom in on something in the middle of the left side here.  What are those?

A.  That's my handcuff pouch.

Q.  And then it looks like your left leg is kind of wet.  How did that happen?

A.  From me being drug in the grass.  The grass was wet with dew.

Q.  Okay.  Now on to the third page of Government's Exhibit 7.

What are we looking at now?

A.  Some of the rash and cuts.

Q.  Then Government's Exhibit -- or sorry.  The fourth page

Q.  of Government's Exhibit 7, what are we looking at now?

A.  You can see where the blood was dripping from my arm on my tourniquet and then on my pants.

Q.  And I know it's kind of hard to see, but in the middle at the very top of the image, what is this?

A.  That is my badge.  It's a PVC badge issued by the special response team, the SWAT team.

Q.  Did you eventually have to go to the hospital to get medical treatment?

A.  Yes.

Q.  How soon after getting dragged did you have to go to the hospital?

A.  It was right away.  One of my coworkers -- once everybody got there, then I went straight to the hospital after that.

Q.  I'm going to show you now Government's Exhibit 8.

Do you know what Government's Exhibit 8 is?

A.  That's me in the hospital bed.

Q.  Okay.  So we're talking now just about the first page.

That's you in the hospital bed?

A.  Yes.

Q.  Okay.  Let's go to the second page.

What are we looking at now?

A.  I had some -- like some road rash or cut on my nose.

Q.  Then page 3, what are we looking at now?

A.   Lacerations on my right arm and laceration on my left hand and ripped pants.

Q.   Page 4, what's this?

A.   It's my left arm, my left hand.

Q.   And what's depicted here on your left hand?

A.   Lacerations and some road rash.

Q.   How long did it take for the -- a laceration is just a cut; right?  Is that the same as a cut?

A.   Correct.

Q.   How long did it take for that cut on your left hand to heal?

A.   Probably two weeks.

Q.   Did that interfere with your ability to use your left hand?

A.   Yes.

Q.   Going now to page 5 of this exhibit, what do we see here?

A.   Some road rash on my left forearm and my elbow.

Q.   Did the road rash hurt?

A.   Yes.

Q.   How much did that hurt?

A.   Especially taking showers it hurt quite a bit.

Q.   Was the wound clean when you got to the hospital?

A.   No.  They had to clean it.

Q.   And what was that like?

ROSS - DIRECT

A.   I think this one, they didn't put any numbing on this one; so that hurt a lot when they cleaned that one.  And they couldn't -- and even the hand, when they're cleaning the hand, they didn't numb the hand.  Just my right -- right arm they put numbing, but not my left.

Q.   Now, on to the sixth page of this exhibit, what's depicted here?

A.   Some road rash cuts.

Q.   Now to page 7, what's depicted here?

A.   The deep -- the very deep laceration.

Q.   What's here on page 8?

A.   It's a pretty deep -- very deep cuts and some scrapes.

Q.   I'm going to zoom in here at the top.  What did I just zoom in on here?

A.   It's my arm and some tissues.

Q.   Is this the same cut as the longer cut on your forearm?

A.   Yes.

Q.   Okay.  Now, what's here on page 9?

A.   That's my -- my right bicep, and you can see there's some deep lacerations.  It ended up getting infected later on.

Q.   How -- you said that got infected.  What was that like?

A.   Started oozing.  I don't want to get too graphic, but it started oozing a green discharge.

Q.   How long did it take for the infection to get sorted

ROSS - DIRECT

out?

A.   About a week.

Q.   How much did your arm hurt during this period of time?

A.   It hurt quite a bit.  I had almost no mobility as I was moving around.  And twice -- twice a day we had to change the bandages.  And each time you pull the bandage off, it pulls the scab off.  So that was very excruciating pain.

Q.   I think this is our last image from this exhibit. What's depicted here?

A.   It's the stitches and a bruise that's forming.

Q.   Do you know how many stitches it took to close this wound specifically?

A.   This wound, I think this was -- I think it was 17.

Q.   Did you get any other stitches?

A.   Yes.

Q.   What were those?

A.   On my right bicep.

Q.   Do you know how many stitches you had to get on your right bicep?

A.   Not off the top of my head, but I just know the total.

Q.   What was the total number of stitches you had to get?

A.   Thirty-three.  And some of the wounds they couldn't close.  There wasn't enough skin to close it with stitches.

Q.   Do you have any scarring as a result of this?

A.   Yes, I do.

Q.  Do you still have it today?

A.  Yes.

MR. COBURN:  Your Honor, would it be all right if the witness shows the scarring to the jury?

THE COURT:  Any objection?

MR. NEWMARK:  No, Your Honor.

BY MR. COBURN:

Q.  Could you walk the jury through what the different various scars are.

A.  So this is from the laceration you see here in the picture.

And then you can see the scarring here on my lower bicep.

Q.  Okay.  Thank you.  No further questions.

THE COURT:  All right.  Well, I think now is a good time to break unless, Mr. Newmark, you have, you know, ten minutes or something you'd like to get to; otherwise, we'll break until tomorrow.

MR. NEWMARK:  I'm fine with breaking until tomorrow, Your Honor.

THE COURT:  Okay.

Members of the jury, during this recess, as with every other recess, you are not to discuss the case with anyone, including the other jurors, members of your family, people involved in the trial, or anyone else.  Do not allow

anyone to discuss the case with you or within your hearing.

Only you have been chosen as jurors in this case, and only you have sworn to uphold the law.  No one else has been chosen to do this.  You should not even talk amongst yourselves about the case before you have heard all the evidence and the case has been submitted to you by me for deliberations.  Doing so could affect your final decision. If anyone tries to talk to you about the case, please let me know about it immediately.

And when I say you must not discuss the case with anyone, I mean do not email or text, blog, or engage in any form -- written, oral, or electronic communication -- just as I have instructed you before.

Do not read any newspaper or other written account, watch any televised account, listen to any radio program about this trial.  Do not conduct any electronic research or consult with any other sources about this case, the people involved in the case, or its general subject matter.

You must keep your mind open and free of outside information.  Only in this way will you be able to decide the case fairly based solely on the testimony, evidence presented in the courtroom, and my instructions on the law. It's very important that you follow these instructions.

I may not repeat these things before every recess but they do apply each recess.

And as I mentioned before, in the morning, when I see you again, I may ask you to see whether or not you are able to comply with these instructions.  So you should know that question can be coming, and I hope that you're able to give the correct answers when I do see you in the morning.

We are going to break until 9 o'clock.  So if you can be here as close to 8:45 as possible.  We'll begin again, the trial, at 9 o'clock.

All right.  All rise for the jury.

**(JURY NOT PRESENT.)**

THE COURT:  All right.  Anything to put on the record?

MR. COBURN:  No, Your Honor.  Nothing at this time, Your Honor.

MR. NEWMARK:  No, Your Honor.  Thank you.

THE COURT:  All right.  I'll see counsel tomorrow morning.  If you-all can be here around 8:30, and that way if there are any issues that come up between now and tomorrow, we'll have a little bit of time before 9 o'clock to address those.

MR. NEWMARK:  Your Honor, my understanding is my client will be brought here around 8:30, and I'm hoping to spend a little bit of time with him in the morning. Sherburne no longer allows in-person visits after 4:30 so I will be able not to speak to him until tomorrow morning.  So

I'm wondering if I could have maybe 15 or 20 minutes at 8:30 before I appear.

THE COURT:  That's totally fine.

MR. NEWMARK:  Thank you.

THE COURT:  All right.  Court stands in recess.

(Proceedings were concluded at 4:42 p.m.)

CERTIFICATE OF COURT REPORTER


I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the testimony of Jonathan Ross to the best of my ability.


                    Dated this 8th day of January, 2026.


                    /s/ *Nancy J. Meyer*
                    Nancy J. Meyer
                    Official Court Reporter
                    Registered Diplomate Reporter
                    Certified Realtime Reporter