UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

UNITED STATES OF AMERICA,          )   Case No. 0:25-cr-00246
                                   )            (JMB/SGE)
                    Plaintiff,     )
                                   )
v.                                 )
                                   )
ROBERTO CARLOS MUÑOZ-GUATEMALA,    )   St. Paul, Minnesota
                                   )   **December 9, 2025**
                    Defendant.     )   9:00 a.m.
                                   )

_____

**BEFORE THE HONORABLE JEFFREY M. BRYAN**
**UNITED STATES DISTRICT JUDGE**

**TESTIMONY OF JONATHAN ROSS** (continued)

APPEARANCES:

For the Government:      Raphael Coburn
                        Thomas Calhoun-Lopez
                        UNITED STATES ATTORNEY'S OFFICE
                        FOR THE DISTRICT OF MINNESOTA
                        300 South Fourth Street
                        Minneapolis, Minnesota 55415

For the Defendant:      Eric L. Newmark
                        NEWMARK LAW OFFICE
                        1600 Hopkins Crossroad
                        Minnetonka, Minnesota 55305

Court Reporter:         Nancy J. Meyer
                        Registered Diplomate Reporter
                        Certified Realtime Reporter
                        Warren E. Burger Federal Building
                        and United States Courthouse
                        316 North Robert Street
                        St. Paul, Minnesota 55101

Proceedings reported by certified stenographer; transcript
produced with computer technology.

**I N D E X**

PAGE

**WITNESSES**
JONATHAN ROSS, continued
    Cross-Examination By Mr. Newmark      13
    Redirect Examination By Mr. Coburn      24
    Recross-Examination By Mr. Newmark     27

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendant present.)

**(JURY NOT PRESENT.)**

THE COURT:  All right.  Thank you.  You may be seated.

Good morning.  Why don't we start by swearing in the new interpreter.

THE COURTROOM DEPUTY:  Please raise your right hand.

(Oath administered.)

THE INTERPRETER:  I do.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  All right.  Before we bring out the jury, are there issues that the Court needs to address this morning?

Mr. Newmark?

MR. NEWMARK:  Your Honor, there are a few issues that counsel and I discussed this morning.  The first is that there was some testimony by Officer Ross yesterday sort of relating to his general investigations.  He talked about transnational organizations and cartels and things like that.

I intend to ask a few questions, maybe two or three, of the officer, essentially asking him whether the basis for

this arrest was simply that my client was not lawfully in the United States.  I don't intend to get into any more than that, but just to counter any thought the jury might have that there was some cartel investigation or something else relating to this defendant.

The reason why I flag it is I wanted to make sure the government doesn't believe that opens the door to the officer then testifying as to what the underlying felony was and the reason why this arrest was conducted the way it was.

It's my understanding the government does not believe if I limit those -- just to those two or three questions that it opens the door to anything beyond that, and we'll simply leave it at that.  The basis for this arrest was my client was not lawfully in the country.

MR. COBURN:  Your Honor, the government does agree that those few questions would not open the door.  However, I would ask for an opportunity before Officer Ross retakes the stand for cross-examination to advise him that these questions are coming.

Because I know that Officer Ross would say that, you know, although it wasn't a transnational criminal organization nexus that contributed to, you know, why the defendant was being targeted, it was because he was considered a high priority target due to his prior criminal

conviction.  So I would request an opportunity to just let him know and to advise him, again, to not get into the underlying facts or anything about the prior conviction.

THE COURT:  Yeah, no.  I think that makes sense. I'll give you a bit of a minute to explain that to him.

I know Mr. Newmark didn't make the 403 motions around the word alien, or we didn't really have much discussion beforehand about how the nature of his criminal history might explain, sort of, the context around what is happening here.

So I think because -- because we didn't have those motions ahead of time, you didn't have exactly that guidance to provide to Agent Ross.  But I think that that's correct; that his testimony went one step too far.  And so it makes sense that we can cure it or try to, you know, ask some additional questions to -- to shift the attention away from some of the -- that testimony yesterday as a way to address that step too far, in my mind.

So I don't think it opens the door, and I appreciate the government's concession on that.  And I'll make sure you have a chance to talk to with him and advise him on how to respond to those questions.

MR. COBURN:  Thank you, Your Honor.

And, also, I did advise Officer Ross yesterday during that sort of brief opportunity I had to speak with him that

he should avoid using the term alien.  So I hope that does not happen again, Your Honor.

MR. NEWMARK:  Your Honor, the other issue that came up yesterday was that Officer Ross testified that my client invoked his right to counsel.  I didn't object to it at that time.  I was, frankly, quite shocked that he said it.  It was not in any of his previous statements, and it's my understanding he never -- the government was as surprised as I was that he said it.

I do acknowledge that it might have some marginal relevance to the issue of who my client thought Officer Ross and the other officers were.  And so I guess I don't object -- I'm not asking the Court to give a curative instruction.  I do see -- it's certainly not relevant in terms of him invoking -- you know, generally speaking, there's no testimony regarding my client's invocation of his right to counsel.

But given the lay of the land here and given that, I assume, the officer is going to testify that there were no pending criminal charges against my client, its value is limited to whether my client believed he was talking to law enforcement or someone who was trying to do him harm.

So I just wanted to flag that.  The government certainly can't use it to imply my client was hiding something by invoking his right to counsel.  And I do intend

to cross-examine on the fact that this was the first time that this has ever been mentioned by the officer before on the witness stand.  He didn't say it in his previous interview to the FBI.  He didn't say it in his trial preparation interview with the government.  So I think it was a surprise to me and to the government that he said that on the witness stand.

THE COURT:  So are you asking for -- so you're not asking for any instruction at all?

MR. NEWMARK:  I'm not.  I'm just asking that -- and I think the government would agree -- that any relevance is limited to who he thought he was talking to, not that he was invoking his right to counsel because he --

THE COURT:  All right.  So are you anticipating a relevance objection?

MR. NEWMARK:  Depending on how it's -- depending on what they ask.  I don't -- I do see that there's relevance to who he thought he was talking to.  He's certainly not going to ask a lawyer.

THE COURT:  Maybe.  I mean, I don't know.  Maybe people --

MR. NEWMARK:  I guess, it'll depend on how the question is asked.  I just wanted to raise it for the Court. I'm not sure what the government is going to ask on redirect and what they would argue in their closing.  But I certainly

don't think it's admissible to show that he was, you know, invoking his right to silence because he was avoiding self-incrimination.

THE COURT:  All right.  I mean, there's the right to remain silent, which is separate from the right to counsel, but they're found in the same part of the Constitution.  So I understand why you've linked them.

I'm not sure the relevance is that -- is all that relevant.  I think even if somebody had the misimpression that the law enforcement officer was not, in fact, a law enforcement officer, you might still ask those kinds of questions.  It's along the lines of like, what -- can I see your badge or whatever, someone might want to ask to verify it.  It's as much relevant or could show that as it shows the opposite.

So I'm not sure it really is that relevant, to be honest, but I understand why you might want to address it on cross-examination.  I'm not clear if you're asking -- you're trying to sort of give me a heads-up on whether you're going to make a relevance objection or whether you think the government's going to make a relevance objection.

MR. NEWMARK:  I don't anticipate the government making a relevance objection.

THE COURT:  Okay.

MR. NEWMARK:  The questions in cross are going to

relate to, I think, he just made it up on the stand. He never said it before. I think he said it for a particular reason, which was to make it sound like he was talking to law enforcement.

THE COURT: All right. So this is an avenue for, sort of, an impeachment line of questioning by omission?

MR. NEWMARK: Correct.

THE COURT: Okay.

MR. COBURN: In the government's view, Your Honor, this is fair grounds for impeachment. It's correct that, you know, Officer Ross did not previously say that -- as far as I know, that the defendant asked for an attorney. So I do think it's fair grounds for impeachment.

That said, I would not necessarily agree with the Court as to the relevance. I do think if -- particularly if the defense is going to focus on this issue as a grounds for impeachment, I think from the government's perspective, it is pretty relevant and it is something we would want to argue in closing; that I do not believe that you would ask someone you believe to be a carjacker that you wanted an opportunity to speak with your lawyer. I think it does get to the -- the defendant's knowledge of who he was interacting with.

And so if -- particularly if the defense is going to hammer this issue home on cross, I think we should be

allowed to argue it in closing.

THE COURT:  Well, I mean, if it is for impeachment purposes only and not substantive, then there is some limitation.

I think you're right, though, that there's -- there's two steps.  One is admission, and then the second is what you can argue.  And I don't know -- are you asking me to make a ruling that they're prohibited from arguing?

MR. NEWMARK:  Not at this time.  I just wanted to flag it for the Court, and depending on how -- how it's -- how it comes up in cross, you know, what the answers are, and then determine --

THE COURT:  Well, if we get to that point and you're -- you're now making an argument prior to closing arguments that the government should be precluded from suggesting that inference or suggesting that the jury draw that conclusion, I think that's a pretty different analysis than the relevance -- where we started with relevance.  And impeachment is going to be relevant so -- but maybe limited.

All right.  Well, I appreciate the heads-up, flagging the issue.  I don't anticipate there being any rulings on this today because I don't think it's going to come up in that way.  And as I said, it's at least enough to probably surpass the requirement for relevance.  And then we'll leave for another day whether it's limited -- the government would

be limited in on how they could argue the facts that come out in the testimony.

Okay. Anything else before we bring out the jury and the witness?

MR. COBURN: One other very brief issue, Your Honor.

I know that Mr. Newmark yesterday had mentioned a stipulation regarding the existence of this police report. We had talked about, this morning, whether it needed to be a written stipulation or we could just, I guess, do an oral stipulation in front of the jury given that, you know, this isn't a stipulation to an element of facts that would satisfy an element of the offense or something.

I think we agreed that we could probably just do an oral stipulation and that the parties would just hammer out probably one sentence that we would agree is correct.

THE COURT: I mean, I have a preference -- any stipulation of fact, I think, should be written out so the jury sees it that way. I have a preference for that. Especially if it's one sentence, that's probably not too difficult to do.

If there's some other stipulation where you just expect that the witness will say a certain fact and we leave it at that, then that's also fine. And I don't even know that that requires, frankly, me to do anything.

But if it's a stipulation of fact, then I think it's important to have that written out, and then that would trigger the -- the model instruction around stipulations of fact.

MR. COBURN:  All right.  Well, Mr. Newmark and I can discuss exactly what that language would be, but I do anticipate it would be very, very short.

THE COURT:  Okay.  All right.  Anything else?

MR. COBURN:  Just briefly, an opportunity before the jury is brought in, Your Honor, so that I could speak with Officer Ross.

THE COURT:  All right.  We'll give you a few minutes, and we'll go off the record.

(Off the record.)

**(JURY PRESENT.)**

THE COURT:  All right.  Thank you.  You may be seated.

And good morning, members of the jury.

MR. COBURN:  Your Honor, may I bring Officer Ross back in?

THE COURT:  Yes.

MR. COBURN:  Thank you, Your Honor.

THE COURT:  Go ahead and have a seat.

And you remain under oath from yesterday.

THE WITNESS:  Yes, Your Honor.

THE COURT:  And you may inquire, Mr. Newmark.

MR. NEWMARK:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. NEWMARK:

Q.  Good morning, Officer Ross.

A.  Good morning.

Q.  Yesterday you testified as to some of the investigations you do.  You talked about cartels.  You talked about multinational organizations.  Do you remember that testimony?

A.  Yes.

Q.  All right.  None of that had anything to do with the attempted arrest of Mr. Muñoz-Guatemala, would you agree?

A.  Correct.

Q.  The basis, essentially, for his arrest was that he was unlawfully in the country?

A.  Correct.

Q.  Not related to any of these other investigations?

A.  Correct.

Q.  All right.  The vehicle that you were driving and that the other officers -- the vehicles the other officers were driving were not marked squad cars; would you agree with me?

A.  Yes, they're unmarked.

Q.  They're, essentially -- they look like civilian vehicles, especially if they're not -- if the lights aren't

on?

A. Correct.

Q. They're -- were they all SUVs?

A. I believe -- mine was an SUV. The other ones were crossovers, to be technical, yes.

Q. So SUVs or crossovers, they appear -- if you're driving down the street, they appear to just be civilian vehicles; would you agree?

A. Correct.

Q. All right. You don't know -- so you were the one who's generally behind my client at some points, but not at every point; would you agree?

A. Yes.

Q. And is it fair to say you weren't looking at the other vehicles at the time to know what lights they had on or things like that?

A. I could see the -- the FBI special agent in front of me when we first tried to initiate the vehicle stop, and I noted his lights were on.

Q. You don't wear a body cam; is that correct?

A. Correct.

Q. And as far as you know, none of the vehicles are equipped with dash-mounted cameras?

A. Not that I'm aware of.

Q. And you had testified that the reason why you don't wear

a body cam is because there's no policy in your office about wearing body cams?

A.  Correct.  We have no way of storing the footage. There's no policy in our area, in the St. Paul Field Office, that covers the various states.  We have no policy for body cam.

Q.  All right.  So that's just an internal decision not to have officers wear body cams; fair to say?

A.  I -- I don't -- I can't speak on that.  I know that it's -- it was rolled out to certain offices throughout ICE, and ours was not one of them that was rolled out at that time.

Q.  Other agencies have the availability of body cameras; is that correct?

A.  Yes.  And some of our offices do have it, just not our AOR.

Q.  Yours don't.

Do you know whether any other agencies within ICE provide for dash or -- you know, dash cameras, mounted cameras on your squad -- or, I'm sorry, on your vehicle?

A.  I'm not aware of any that have any dash cams.

Q.  You would agree with me that if there were dash cams that had video and sound, we would be able to see better what the stop looked like; fair to say?

A.  Yes.

ROSS - CROSS

Q. All right. And, again, that's a decision that is an internal decision of ICE, not to have those available; is that correct?

A. I can't speak on that, but we don't have them. There's no policy in our AOR for it.

Q. You're aware that many agencies, especially in Minnesota, have that footage available; correct?

A. Yes.

Q. In fact, almost every local police department and sheriff in the state of Minnesota has that footage available; is that correct?

A. At least some marked units. I'm unaware about any unmarked units.

Q. And the reason for that is, so instead of having to rely on the memory and the testimony of law enforcement or other people, we can exactly see what happened; is that correct?

A. Correct.

Q. And we have the benefit of some video footage in this case that we saw yesterday; correct?

A. Correct.

Q. But we don't have the benefit of that footage because none of the officers in these civilian vehicles had that type of video equipment available; fair to say?

A. Correct. To my knowledge, there's only two FBI agents that had body cams with them. I believe the border patrol

ROSS - CROSS

agent that showed up later on, he may have had a body cam, but he wasn't in the scene.

Q. Right. Well, what I'm talking about is body cam that would show what lights were on, you could hear the sirens during the stop. Is that correct?

A. Correct.

Q. And that would be easy to have if you had that type of camera; you just don't have it. Is that right?

A. Correct.

Q. The officer -- the officers who had body cam did not immediately have those on; would you agree?

A. Yes.

Q. So during a lot of this investigation, such as viewing Mr. Muñoz-Guatemala leave his home, seeing him enter his vehicle, seeing him drive away, the vehicles approaching, none of that is available because the body cams were not turned on; is that correct?

A. To my knowledge, correct.

Q. Do you know, is there -- well, you don't have a body cam so you don't know what policies exist.

All right. But in any event, none of this video is available because you just simply don't have that equipment which is available in many other law enforcement agencies; fair to say?

A. Correct.

Q.  All right.  You testified yesterday that Mr. Muñoz-Guatemala had at some point asked to speak to his lawyer or said he didn't want to answer any questions without his lawyer present; is that correct?

A.  Correct.

Q.  You were interviewed in this case on at least two occasions; is that correct?

A.  That I was interviewed?

Q.  Yeah.

A.  Yes.

Q.  You were interviewed in the hospital by the FBI; is that correct?

A.  Correct.

Q.  You were -- also met with the three individuals at this table, counsel for the government, as well as the case agent, in the last few days; is that correct?

A.  Correct.

Q.  And that was for the purpose of going over your testimony, perhaps remembering things you hadn't said before, things like that; is that correct?

A.  Correct.

Q.  At no point in either of those interviews did you ever mention Mr. Muñoz-Guatemala asking for an attorney; isn't that fair to say?

A.  Yeah.  That's fair to say, yeah.

ROSS - CROSS

Q.   So the first time you said it to anybody, including the law enforcement or lawyers for the government, was on the witness stand yesterday?  Yeah?

A.   Correct.

Q.   Okay.  Is there a reason why you didn't mention -- well, I'll strike that question.

Obviously, we've seen the video so I'm not going to ask you a whole lot of questions about what happened because we can see that.  I just want to ask you a couple of things.

You would agree with me that it's difficult to estimate speed in the situation you were in; is that correct?

A.   Correct.

Q.   It's much easier to estimate speed in situations you're used to, such as pacing a vehicle, observing a vehicle driving past you; is that correct?

A.   Correct.

Q.   Would you agree with me that 40 miles per hour might be quite a bit faster than the vehicle was actually going during that time period?

A.   I don't know.  It was going pretty fast.  The engine was revving, so I --

Q.   It certainly would be difficult for you to ascertain speed with everything else that was going on; fair to say?

A.   Correct.  It was a guesstimate.

Q.  I looked it up.  The fastest human ever recorded is Usain Bolt, the Olympic sprinter, and he -- his fastest speed is under 28 miles an hour.

A.  Okay.

Q.  All right.  Based on that, you would agree with me that you probably weren't going 40 miles per hour when the vehicle -- when you were -- your arm was in the vehicle.  Would you agree with that?

A.  You're referring to me running with the vehicle or being dragged?

Q.  You would agree with me that 40 miles an hour is probably an overestimate of how fast you were going?

A.  I don't know.  I didn't -- I'm sure there's ways to figure out how fast, but I'm not quite sure.

Q.  Okay.  You didn't -- you don't know.  When you said 40, that was just a guess on your part?

A.  Just a guess.  I couldn't see a speedometer.

Q.  Could have been quite a bit slower; is that fair to say?

A.  Could have been.

Q.  When you encountered Mr. Muñoz-Guatemala, we already talked about that you weren't in a marked squad --

THE COURT REPORTER:  You have to slow down.

MR. NEWMARK:  I apologize.

BY MR. NEWMARK:

Q.  When you approached the vehicle, you were not wearing --

we talked about this -- like a police uniform; fair to say?

A.  I was wearing police identifiers.

Q.  All right.  You've -- we've seen the video.  You were wearing kind of a gray-greenish sort of color; is that accurate?

A.  The actual color of the vest is called ranger green, and I had gray pants.

Q.  All right.  So gray-greenish.

It was not, like, a typical patrol uniform, like, you know, blue, that sort of thing; is that correct?

A.  That's correct.

Q.  You didn't have a badge that you showed Mr. Muñoz-Guatemala, did you?

A.  I had a badge on my -- on my belt.

Q.  Right.  Certainly not easily visible to a person inside the vehicle; would you agree?

A.  If you look down at it, they should be able to see it.

Q.  Did you make any effort to show it to him?

A.  The badge?

Q.  Yes.

A.  No.

Q.  All right.  You would agree with me that Mr. Muñoz-Guatemala asked you more than once who you were; is that right?

A.  Yes.

Q. "Who are you? Who are you?"

A. Yes. And I identified myself as various -- in Spanish and English, yes.

Q. And it appeared to you that Mr. Muñoz-Guatemala was confused as to who you were; is that correct? He never acknowledged that you were police to you?

A. He didn't seem confused. He seemed to know who I was just by his demeanor. He didn't -- he didn't -- he didn't present any cues that he was confused.

Q. He didn't say anything to you acknowledging that he -- that he identified or recognized you as law enforcement; would you agree?

A. He didn't say anything that he would -- that would lead me to believe that he was not --

Q. It wasn't what I asked.

A. Go ahead.

Q. Well, when he asked you who you were, who you were, clear indication of he wasn't sure who you were; right?

A. I wouldn't -- we encounter that very often so -- where they act like they're confused, but --

Q. Well, you would encounter that more often than a uniformed squad patrol-type officer; is that -- would you agree with me on that?

MR. COBURN: Objection. Speculation, Your Honor.

THE COURT: Why don't you lay some foundation.

Sustained.

BY MR. NEWMARK:

Q.   You testified that people are oftentimes confused or ask you who you are; is that correct?

A.   In my experience, it seems to be a cycle of what people resort back to when they don't know what's going on in a situation.

Q.   Not the question that I asked.

The question that I asked is, you would -- you just testified that people often ask who you are, don't readily acknowledge that you're law enforcement; is that correct?

A.   I suppose, but --

Q.   Do you ever execute stops or any type of law enforcement with local police, uniformed police officers in squad vehicles?

A.   Recently?

Q.   Ever.

A.   Within -- ever?

Q.   Ever.

A.   Yes, I have.  Yes.

Q.   Have you ever seen a person not understand that a uniformed individual wearing a badge, wearing blues in a squad car are not confused with other people other than law enforcement; right?

A.   When I was a U.S. Border Patrol agent, people would ask

me over and over again who I am, and I'd be in --

THE COURT:  Sir, you're going to have to listen to the question and just answer the question that was asked. Okay?

Do you want me to repeat it, Mr. Newmark?

MR. NEWMARK:  Yes, Your Honor.

THE COURT:  The question was:  Have you ever seen a person not understand that a uniformed individual wearing a badge, wearing blues in a squad car are not confused with people other than law enforcement; right?

A.  Correct.

BY MR. NEWMARK:

Q.  But people are, as you said, confused when you approach them based on the perception of what you're wearing and the vehicle that you're in; would you agree with that?

A.  At times, I suppose.

Q.  Right.  And this is one of those, at least that's what was expressed to you?  Yes?

A.  Yes.

MR. NEWMARK:  No further questions, Judge.

THE COURT:  All right.  Redirect.

MR. COBURN:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. COBURN:

Q.  Good morning, Officer Ross.

A.   Good morning.

Q.   You were asked some questions on cross-examination about prior statements you gave.  Do you remember that?

A.   Yes.

Q.   The first time you gave an interview about what happened to you on the 17th, do you remember what day it was?

A.   It was that -- that same day, the 17th.

Q.   And where did you give that statement?

A.   The hospital.

Q.   How long after the dragging incident did you give that statement?

A.   I would say within an hour.  I wasn't even stitched up.

Q.   Were you in any pain or discomfort at the time you were giving that statement?

A.   Yes.

Q.   Were you still feeling significant effects from having been dragged for over a hundred yards?

A.   Yes.

Q.   You were also asked about your estimate of how fast you were going -- or how fast you were being dragged.  Do you remember that?

A.   Yes.

Q.   Your estimate of around 40 miles an hour, was that when you were running to keep up with the vehicle at the beginning of being dragged or some other time during the

approximately 12 seconds you were being dragged?

A.   That would have been when I was -- I couldn't keep up anymore.  Mostly when -- on the road and then up on the -- on the lawns.

Q.   So at what point during those 12 seconds that you were being dragged did the vehicle hit the highest speed?

A.   It was either on the road or the lawn.

Q.   Was the speed of the vehicle constant throughout those 12 seconds, or did it go up and down?

A.   It would go up and down.

Q.   You also, finally, were asked some questions about confusion, as to whether you're a police officer when you do traffic stops; correct?

A.   Correct.

Q.   And you testified, I believe, just now that some -- it's not uncommon for people to ask who you are or ask questions of that nature; correct?

A.   Correct.

Q.   On your -- based on your experience having -- I think you testified yesterday, conducting hundreds of traffic stops, do you believe that's genuine confusion or is that something else?

        MR. NEWMARK:  Objection.  Foundation.

        THE COURT:  Overruled.

A.   I believe it's -- it seems to be something that some

ROSS - RECROSS

people just -- just say to -- to stall.  I believe a lot of time people are on the phone and they're waiting for people to get -- to show up, especially with our line of work. They've got phone trees where they call and then protesters show up.

MR. COBURN:  Okay.  No further questions, Your Honor.  Thank you.

**RECROSS-EXAMINATION**

BY MR. NEWMARK:

Q.  Counsel for the government asked you the circumstances of the interview that you gave at the hospital when, obviously, you were in some distress; right?

A.  Yes.

Q.  But you gave another interview last week?

A.  Yes.

Q.  December 3rd; right?

A.  Yes.

Q.  In preparation for your trial testimony?

A.  Yes.

Q.  With these three individuals at the table?

A.  Yes.

Q.  You were not in distress at that point; is that correct?

A.  No.

Q.  You had the opportunity to remember the events when you gave that interview; is that correct?

A.  Correct.

Q.  And you understood the purpose of that interview was to make sure that counsel for the government knew what your testimony was going to be and that would be provided to the defense so we would know what your testimony was going to be; right?

A.  Correct.

Q.  And you didn't mention anything about asking for a lawyer; true?

A.  Yes.

Q.  You testified, also, just a minute ago, that you believe that oftentimes some individuals are trying to delay or stall by asking who you are or pretending to be confused; is that correct?

A.  Correct.

Q.  You don't know what was going on in Mr. Muñoz-Guatemala's mind; is that fair to say?  You can't speculate as to why he was asking those questions or whether he was confused?

A.  Yes.  Correct.

MR. NEWMARK:  Nothing further.

MR. COBURN:  No further questions.

THE COURT:  All right.  Thank you very much. You're excused, sir.

(Witness excused.)

(REPORTER'S NOTE:  Further proceedings were heard in the above-mentioned matter after Jonathan Ross's testimony, which were not requested to be transcribed at this time.)

CERTIFICATE OF COURT REPORTER

I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the testimony of Jonathan Ross to the best of my ability.

Dated this 8th day of January, 2026.


/s/ *Nancy J. Meyer*
Nancy J. Meyer
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter