UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
*Criminal No.* 25-CR-00246(JMB/SGE)

---

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>      Plaintiff, )<br>Vs. )<br><br>ROBERTO CARLOS MUNOZ- )<br>GUATEMALA, )<br><br>   Defendant. ) | **DEFENDANT'S MOTION FOR DISCOVERY** |

---

Defendant moves this Court, pursuant to the Federal Rules of Criminal Procedure for the following orders:

1.) An Order requiring the Government to disclose Enforcement and Removal Officer Jonathan Ross' full law-enforcement training file.

2.) An Order requiring the Government to disclose the full investigative file related to ERO Jonathan Ross' shooting of Renee Nicole Good on January 7, 2026.

This Motion is based upon all the files, records, proceedings herein and the following Memorandum.

## FACTS

On June 17, 2025, multiple federal agencies, including the Federal Bureau Investigation (FBI), Enforcement and Removal Operations (ERO) and Homeland Security went to Defendant's address in Bloomington, Minnesota, with an administrative warrant for Defendant's arrest due to his unlawful entry into the United States and lack of lawful immigration status.

After conducting surveillance at the residence, officers observed Defendant exit his residence and enter a champagne-colored Nissan Altima and drive away. The agents testified at trial that they followed and ultimately stopped the defendant.

Enforcement and Removal Officer Jonathan Ross and other agents surrounded Defendant's car and exited their vehicles to approach Defendant's Altima. Ross testified he verbally identified himself as a federal law enforcement officer. Both Ross and FBI Special Agent Bernardo Medellin had their service weapons drawn as they approached his vehicle. Ross claimed when he approached the driver's side window, he ordered Defendant in both Spanish and English to place his vehicle in park.

According to Ross, Defendant did not place his vehicle in park but lowered his window a few inches. Ross testified he asked Defendant for his identification, which Defendant held up to the window. Ross also claimed at trial, for the first

time, that the Defendant asked to speak with his attorney.  No other officer at the scene heard this alleged statement.  According to Ross, Defendant then placed his vehicle into park. Ross then told Defendant to lower his window and open the door. According to Ross, after Defendant refused several times, Ross took a spring-loaded window punch and forcefully shattered the driver's side rear window of Defendant's Altima. Ross then reached into the vehicle with his right hand.

Body camera footage played at trial showed that while Ross' right arm was inside the vehicle, Defendant put the vehicle into drive, turned his wheel to the right, drove up onto a curb, and accelerated away. Because Ross' arm was caught in the vehicle, Ross was dragged with the vehicle as Defendant drove away.  In total, Ross was dragged approximately 100 yards. After Ross broke free of the vehicle, Defendant drove to his girlfriend's house where he called 911 to report he had been assaulted.

There is no video footage of the pursuit or stop of Defendant's vehicle, nor of the interaction between Defendant and the officers, as the agents were either not wearing or had not activated body cameras.  None of the law enforcement vehicles were equipped with dash-mounted cameras. FBI Special Agent Todd Schallberg, whose camera footage was played at trial, testified he did not turn his body camera on until after the window had been shattered by Ross.

Defendant was indicted on the charge of Assaulting a Federal Officer. At trial, the Jury was instructed as follows regarding the elements of the crime:

> The crime of assault on a federal officer has three elements, which are: *One*, the defendant forcibly assaulted or forcibly resisted Enforcement and Removal Operations Officer Jonathan Ross;
> *Two*, the assault or resistance was done voluntarily and intentionally; and
> *Three*, at the time of the assault or resistance, Enforcement and Removal Operations Officer Jonathan Ross was doing what he was employed to do by the federal government and performing federal investigative, inspection, or law enforcement functions.

At trial, Defendant testified he did not know that the person who broke the window on his car was a law enforcement officer. He also testified that he did not know that he was dragging Ross as he drove away after Ross broke his back window. He received the following jury instruction at trial on the issue of intent:

> To establish the second element—that the assault or resistance was done voluntarily and intentionally—the government must prove that Mr. Muñoz-Guatemala should reasonably have known that Jonathan Ross was a law enforcement officer and not a private citizen attempting to assault him. If the government does not prove that Mr. Muñoz-Guatemala should reasonably have known that Jonathan Ross was a law enforcement officer and not a private citizen, and if you also find that Mr. Muñoz-Guatemala's conduct in driving away was a reasonable response, then you must find Mr. Muñoz-Guatemala not guilty.

On December 10, 2026, the jury returned a guilty verdict.

After the incident on June 17, 2025, the United States Government began an operation in Minnesota dubbed "Metro Surge."  It has been reported that more than 3,000 federal officers descended on the State of Minnesota, purportedly to enforce federal immigration law. This operation has been the subject of federal lawsuits

brought by both governmental agencies and private citizens, alleging that officers involved have terrorized residents of Minnesota and violated Constitutional rights.

On January 7, 2026, within weeks of trial, Ross, while on duty, killed unarmed mother and United States citizen Renee Good in an internationally publicized shooting. Per news reports, and observer video footage, Ross fired several shots into a vehicle occupied by Good, resulting in her death. Several videos of the incident are publicly available. One video shows that at 9:35 a.m., just two minutes before the shooting, Good's Honda Pilot is stopped diagonally on Portland Avenue, a two-lane one-way street in Minneapolis. At least four cars pass perpendicularly while Good's car is in the street. Several federal officers can be seen approaching Good's vehicle.

Another video shows that at approximately 9:36 a.m., a woman identified as Good's partner, interacts with a federal agent, later identified as Jonathan Ross. Both individuals appear to be video recording each other with their cell phones. Ross subsequently moves towards the front of the vehicle.

In another video, showing approximately the same timeframe from Good's perspective, Good is seen waiving her hand through an open driver's side window to gesture towards cars passing by her. A truck with flashing red and blue lights stops near the vehicle, and two federal officers get out of the truck and approach Good's Honda Pilot.

These officers order Good to get out of the car. While the officers are approaching her vehicle, Good puts the Honda Pilot into reverse. One officer puts his hand on the bottom of the Pilot's driver-side front window, and his other hand is near the door handle. He remains in this position as the Pilot backs up a few feet with the front wheels of the car positioned towards the left.  Good talks to the officers briefly about her license plates, and states "that's fine dude. I'm not mad at you." One officer who was behind the vehicle, later identified as Ross, moves towards the front driver's side of the Honda Pilot.

Just after 9:37 a.m., the Honda Pilot begins to move forward, and the wheels turn to the right, away from where Ross is standing. He pulls out his gun with his right hand, his left hand still holding his phone. Ross fires his first shot through the front windshield of Good's vehicle. As the car continues to move forward, he fires a second shot. Ross shoots at least one more shot through the driver's side window as the vehicle passes by him. The car continues traveling forward and crashes into a parked car. Moments after firing the fatal shots, Ross is heard saying "fucking bitch."

Autopsy results, reported in the media, demonstrate bullets struck Good's forearm, chest, and the left side of her head, resulting in her death.

Per media reports, the Minnesota Bureau of Criminal Apprehension was prohibited from accessing the scene and investigating the incident.  Reports also

indicate that, to date, federal authorities, despite requests from various agencies in the State of Minnesota, have not provided the State of Minnesota with any investigative files related to the shooting of Renee Nicole Good by Jonathan Ross.

**I.)    The full investigative file related to the shooting of Renee Nicole Good by Jonathan Ross on January 7, 2026, is necessary under Federal Rule of Evidence 404 for Defendant to assess what defenses he could potentially assert at a new trial.**

Rule 404(b) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Propensity evidence, whether of a person's general character or examples of specific bad acts, is ordinarily excluded because of the likelihood the jury may misuse it. *United States v. Johnson*, 439 F.3d 884, 887 (8th Cir. 2006)

Rule 404(b) provides, however, evidence of prior bad acts "may ... be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rule 404(b) is thus "a rule of inclusion rather than exclusion and admits evidence of other crimes or acts relevant to any issue in the trial, unless it tends to prove only criminal disposition." *United States v. Simon,* 767 F.2d 524, 526 (8th Cir.1985) (internal quotations omitted). Thus, evidence of prior bad acts "probative of the crime charged" is not excluded under Rule 404(b). *United States v. DeLuna,* 763 F.2d 897, 913 (8th Cir.1985).

Other acts evidence is admissible under Rule 404(b) if it is 1) relevant to a material issue raised at trial, 2) similar in kind and close in time to the crime charged, 3) supported by sufficient evidence to support a jury finding that a witness committed the other act, and 4) its probative value is not substantially outweighed by its prejudicial value. *United States v. Kern,* 12 F.3d 122, 124–25 (8th Cir.1993).

The Eighth Circuit has explicitly recognized that Rule 404(b) is not limited to prior bad acts but can encompass acts occurring after the incident alleged in the case. In *United States v. Kitchen*, the court stated that Rule 404(b) "is not limited to evidence of prior bad acts; instead, it expressly encompasses 'any other crime, wrong, or act." *United States v. Kitchen,* 149 F.4th 1019, 1026 (8th Cir. 2025), *reh'g denied,* No. 24-1777, 2025 WL 2659221 (8th Cir. Sept. 17, 2025),

The court in *United States v. Grady* similarly held that "the rule permitting admission of extrinsic bad act evidence for a non-propensity purpose embraces not only prior acts but subsequent conduct." *United States v. Grady*, 88 F.4th 1246, 1258 (8th Cir. 2023). *See also United States v. Thomas*, 593 F.3d 752, 758-59 (8th Cir. 2010) (permitting admission of subsequent drug activity occurring four years after the charged conduct because "[c]onsidering the similarities ... we cannot say the mere passage of four years' time renders the evidence irrelevant to show knowledge or intent"); *United States v. Johnson*, 934 F.2d 936, 939-40 (8th Cir.

8

1991) (permitting the admission under Rule 404(b) of two drug transactions that occurred weeks after the charged conduct as probative of the defendant's knowledge and intent).

Federal Rule of Evidence 404(b) permits the admission of evidence of subsequent bad acts offered for non-propensity purposes if the evidence is relevant to a material issue, the evidence is similar in kind and close in time to the crime charged, the evidence is proven by a preponderance of the evidence, and the potential prejudice does not substantially outweigh its probative value. *United States v. Grady*, 88 F.4th 1246, 1258 (8th Cir. 2023).

It may be axiomatic to say Defendant does not know what Defendant does not know, but because Defendant is not privy to the results of the federal investigation regarding Ross' use of force against Good, he is unable to assess all the potential uses of that evidence in a defense at a new trial. However, a possible defense at a new trial could involve whether Ross was the aggressor in his interactions with Defendant. Presumably, after he shot and killed Good, Ross was interviewed regarding his interaction with Good's wife before the shooting, as well as his decision to say "fucking bitch" immediately after firing at least three fatal shots directly at Good. Evidence derived from this interview could have bearing on Ross' motive or intent when he approached Defendant's vehicle and escalated the situation using force and could potentially form the basis for a new trial. Ross'

9

aggressive intent is something that a jury should hear about when assessing whether driving away from the officer was a reasonable response to Ross' actions. The jury could also consider this information when weighing Ross' testimony about his decision to violently escalate the stop of Defendant's vehicle versus Defendant's testimony about what happened that day.

II.)    **The full investigative file related to the shooting of Renee Nicole Good by Jonathan Ross on January 7, 2026, is necessary under Federal Rule of Evidence 405 for Defendant assess what defenses he could assert at trial.**

Federal Rule of Evidence 405(b) governs when specific acts of conduct may be admitted as evidence related to a defense in the Eighth Circuit. Under Rule 405(b), specific instances of conduct are admissible only when "a person's character or character trait is an essential element of a charge, claim, or defense." Fed.R.Evid. 405. This narrow exception to the general prohibition against character evidence requires that character itself be a substantive element that must be proven, of part of a defense, not merely relevant to the case.

The Eighth Circuit has interpreted Rule 405(b) restrictively, requiring that character be truly essential to the defense rather than simply relevant. In *United States v. Gregg*, the court recognized that "testimony by the accused of specific instances of conduct is admissible when his character or a trait of his character is an essential element of his defense" *United States v. Gregg,* 451 F.3d 930, 934 (8th Cir. 2006)

10

For example, "reputation or opinion testimony regarding the victim's character is also admissible under Rules 404(a)(2) and 405(a), since it is pertinent in a self-defense claim to show that the victim may have been the aggressor." *United States v. Bordeaux*, 570 F.3d 1041, 1049 (8th Cir. 2009) *See also United States v. Taken Alive,* 262 F.3d 711, 712, 714 (8th Cir.2001) ("When a defendant raises a self-defense claim, reputation evidence of the victim's violent character is relevant to show the victim as the proposed aggressor.").

At trial, Defendant asserted that he did not know Ross was a law enforcement officer and that it was reasonable for him to drive away from Ross after Ross violently escalated their interaction by breaking the back window. However, had the information on Ross' subsequent killing of Good been available, he may have relied on a second defense, namely, that, even if he did know Ross was a law enforcement officer, he used reasonable force to resist excessive force against a law enforcement officer who was the aggressor.

An individual is not justified in using force for the purpose of resisting arrest or other performance of duty by a law enforcement officer within the scope of his official duties. *See United States v. Schmidt,* 403 F.3d 1009, 1016 (8th Cir.2005) (citing *United States v. Dawdy,* 46 F.3d 1427, 1430– 31 (8th Cir.1995)) ("In our circuit, resistance to an illegal arrest can furnish grounds for a second, legitimate arrest."). But an individual may be justified in using force to resist excessive force

11

used by a law enforcement officer.  *See, e.g., United States v. Taken Alive,* 262 F.3d 711, 714 (8[tt] Cir.2001).

Character evidence in cases involving assaults of law enforcement officers by citizens becomes particularly important when there are no eyewitnesses to the initial confrontation between a law enforcement officer and a citizen, as "the reputation-character evidence relating to (the victim) becomes very important and material to prove (the defendant's) self-defense claim" *Id.*

Defendant was convicted at trial after asserting it was reasonable for him to drive away because he did not know Ross was a law enforcement officer. What is entirely unknown, however, is whether the jury rejected Defendant's premise that he did not know Ross was a law enforcement officer, or whether the jury determined that Defendant was not reasonable in driving away. Evidence of Ross' later shooting of Good could be highly probative of the reasonableness of Defendant's actions at a new trial. If the investigation shows that Ross behaved recklessly and contrary to his training, was the aggressor in the shooting involving Good, and escalated that situation needlessly, then it is essential that a jury be aware of this evidence in its assessment of the reasonableness of Defendant's decisions given Ross' actions in both cases. Like Good, Defendant was sitting in the driver's seat of a running vehicle during a situation that was needlessly escalated by Ross' behavior. The similarities between the cases should compel this

12

Court to allow Defendant access to information that could be essential to his defense should a new trial be granted.

Given the State of Minnesota's complete lack of access to the vehicle in which Good was shot, lack of access to lay witness statements, lack of access to unreleased video evidence, and lack of access to statements by Ross and the other officers who were present at the scene, Defendant has no idea what the federal investigation will show. But until the entire investigative file is released to him, Defendant has no way to assess the true value of this evidence.

**III.)** **Full discovery related to Jonathan Ross' training, as well as the investigative file related to Ross' shooting of Good, is necessary so Defendant can assess whether Defendant reasonably believed he was a law enforcement officer.**

Defendant was convicted at trial after asserting it was reasonable for him to drive away because he did not know Ross was a law enforcement officer. Essential to this defense was Defendant's reasonable perception of Ross' behavior that day, and whether he was acting as if he were a legitimate law enforcement officer. Thus, Ross' training history, and whether Ross acted within his training during other law enforcement activities, becomes highly relevant to Defendant's case. Whereas at the time of trial, Defendant had no reason to question Ross' training as a law enforcement officer, Ross' problematic shooting of Good after placing himself in front of a running vehicle necessitates a deeper assessment into his previous training.

In an initial assessment of Ross' shooting of Renee Good, it is questionable whether he was following the Department of Justice Policy on the use of deadly force as found in Justice Manual 1-16.200, which states the following:

### A. Deadly Force

Law enforcement and correctional officers of the Department of Justice may use deadly force only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person.

1. Deadly force may not be used solely to prevent the escape of a fleeing suspect.

2. Firearms may not be discharged solely to disable moving vehicles. Specifically, firearms may not be discharged at a moving vehicle unless: (1) a person in the vehicle is threatening the officer or another person with deadly force by means other than the vehicle; or (2) the vehicle is operated in a manner that threatens to cause death or serious physical injury to the officer or others, and no other objectively reasonable means of defense appear to exist, which includes moving out of the path of the vehicle. Firearms may not be discharged from a moving vehicle except in exigent circumstances. In these situations, an officer must have an articulable reason for this use of deadly force.

Here, the videos that are available to Defendant show that not only did Ross needlessly place himself in the path of Good's vehicle, he could just as easily moved out of the way of that vehicle when it began to pull forward rather than firing shots first into the windshield and then through the driver's side window as the car passed harmlessly by him. The use of deadly force policy promulgated by the Department of Justice requires that an officer move out of the path of the vehicle before using deadly force.

14

The fact that the full investigative file cannot be reviewed complicates any deadly force analysis as it is unknown which shot resulted in Good's death. Defendant simply does not know whether the federal investigation into the shooting of Renee Good will result in a finding that Ross violated the Department of Justice Policy regarding the use of deadly force, or even if he had ever been trained on that policy whatsoever.

Likewise, Ross has received wide-spread criticism for placing his body near the front of a vehicle that was still in drive. In interviews regarding the fatal shooting of Renee Good, Minneapolis Police Chief Brian O'Hara questioned the tactics Ross, stating it was "not clear" why Ross positioned himself in the path of the vehicle more than once. Without knowing the extent of Ross' training as a law enforcement officer, it is unclear whether he was trained regarding what actions to take around a running vehicle with a person in the driver's seat.

Given that it is unclear whether improper training resulted in the shooting of Good, a question also arises as to whether or not Ross was following his training during his interactions with Defendant, to the extent that decisions that he made contrary to his training as a law enforcement officer informed Defendant's belief as to the identity of the person who reached into his back window. Whether immigration enforcement agents should be allowed to mask their faces has also been the subject of heated debate, such that proposed rules regarding immigration

15

enforcement agencies are shifting toward higher accountability amid congressional demands for reforms, including bans on masks, mandatory body cameras, and stricter use-of-force guidelines.  Ross did not have a body camera capturing the interaction. It is unquestionable that breaking the passenger side window behind the driver was a use of force that escalated an already tense situation. Ross' training on the use of masks, body cameras, and use-of-force are a requisite for Defendant's defense that he did not believe that Ross was a law enforcement agent on June 17, 2025.

In order to assess whether  Defendant should have reasonably known Jonathan Ross was a law enforcement officer, and given that the shooting on January 7, 2026, which has put Ross' training (or lack thereof) into the spotlight, full discovery of Jonathan Ross' training history, as well as the investigative file regarding Good's shooting, is necessary in this case. Whether Ross was trained as a law enforcement officer to shatter and then reach into the back window of a running vehicle with someone in the driver's seat, as well as whether Ross relied on his training in the shooting of Good, is probative to whether a person in Defendant's position would believe that the person with whom they were interacting was a law enforcement officer.

IV.)   **The full investigative file related to the shooting of Renee Nicole Good by Jonathan Ross on January 7, 2026, is necessary so that Defendant can explore mitigating factors at sentencing.**

16

Even if this Court ultimately determines that Defendant is not entitled to a new trial based on newly discovered evidence, he must still be sentenced. Historically, a victim's conduct in the offense behavior may be a mitigating factor at sentencing. Although deleted effective November 1, 2025, by Amendment 836, this deletion aimed to align the guidelines with post-*Booker* practices, acknowledging a shift away from formal departures in favor of variances under 18 U.S.C. § 3553(a), while remaining "outcome neutral," and thus victim conduct is still a consideration for this Court.  U.S.S.G. §5K2.10 read as follows:

> If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding whether a sentence reduction is warranted, and the extent of such reduction, the court should consider the following:
> (1) The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.
> (2) The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.
> (3) The danger reasonably perceived by the defendant, including the victim's reputation for violence.
> (4) The danger actually presented to the defendant by the victim.
> (5) Any other relevant conduct by the victim that substantially contributed to the danger presented.
> (6) The proportionality and reasonableness of the defendant's response to the victim's provocation.

In *United States v. Yellow Earrings,* the Eighth Circuit affirmed a downward departure pursuant to 5K2.10, approving a sentence of 15 months, and a departure of 8 offense levels, even though the Guidelines range for the offense level of 22

17

was 41 to 51. *United States v. Yellow Earrings,* 891 F.2d 650, 653–54 (8th Cir.1989).  In *Yellow Earrings,* the defendant, a woman, stood trial for stabbing a man who had provoked her. Granting a significant downward departure at sentencing, the trial court stated: "The problem of the victim was brought upon, at least in some part, by his own misconduct and his own actions towards you. I do not defend his conduct at all. My sentence indicates that I am not defending your conduct either." *Id.* At 652.  The Eighth Circuit agreed, noting that the victim (1) had publicly humiliated the defendant, (2) had attempted to force her to engage in sexual intercourse, (3) was known to be violent when under the influence of alcohol, (4) was bigger and stronger than the female defendant, and (5) had the advantage of being in his own private residence at the time of the incident.

Defendant is entitled to the full investigation file of Ross' shooting of Renee Nicole Good so Defendant can explore mitigating factors related to Ross' actions in this case. Especially important to a sentencing analysis will be the danger Ross presented to Defendant in June of 2025 as well as the reasonableness of Defendant's decision to leave the scene.

In his confrontation with Good, Ross placed himself in front of a running vehicle. Instead of simply stepping out of the way when the vehicle slowly accelerated forward, he pulled out his side arm, fired one shot through the front windshield, and continued firing shots into the vehicle as it passed harmlessly by

18

him. Instead of immediately checking on Good and ensuring she received medical aid, Ross uttered "fucking bitch," and walked away. Instead of staying on the scene to immediately cooperate with the type of intense investigation necessitated by any law enforcement shooting, it appears he got into his vehicle and drove away.

Given the recklessness of Ross' decision to step in front of Good's vehicle, the violence he showed by continuing to shoot at a vehicle that was passing harmlessly by, and the extreme callousness he displayed after it should have been clear that he either killed Good or injured her terribly, it would be reasonable to assume he presented similar danger to Defendant in June of 2025. However, without the full investigative file, Defendant cannot make that conclusion.

Further, the events of January 7, 2026, have a strong bearing on the reasonableness of Defendant's decision to drive away. If, as Defendant assumes, Ross presented an extreme level of dangerousness to non-law enforcement individuals involved in his investigations, driving away after Ross reached into his back window was a logical and reasonable reaction.

However, Defendant does not wish to assume. He wants his sentencing arguments to be based on a complete understanding of the facts and any evidence derived from the federal investigation. Accordingly, this Court should order the Government to disclose the contents of the entire investigative file of Ross's killing of Renee Good.

19

Respectfully submitted,

**NEWMARK LAW OFFICE**

Dated   February 6, 2026          /s/ Eric L. Newmark
                                  Eric L. Newmark
                                  Attorney ID No. 259792
                                  1600 Hopkins Crossroad
                                  Minnetonka, MN 55305
                                  612-464-1161

                                  Attorney for Defendant